## TABACHNIK et al. v. LAMAR SLIDE FASTENER CORPORATION.

District Court, S. D. New York.
June 27, 1942.

Henry L. Burkitt, of New York City, for plaintiffs.

Proskauer, Rose & Paskus, of New York City, for defendant.

BRIGHT, District Judge.

Plaintiffs move for summary judgment. They do not now ask for any injunction relief. They ask solely that judgment be directed that the defendant is liable to them for their damages and that a Special Master be appointed to determine what damages, if any, they have sustained.

The agreement upon which suit is based is not in dispute. It was made on March

7, 1940. It provides for the sale by defendant to plaintiffs, for use and operation in Mexico, of certain machines for the manufacture and attachment of "zippers". The purchase price of $5,500, has been paid. The agreement also provides for the sale thereafter by defendant of certain parts for the machines, and for certain servicing of the parts and machines. The following provisions are directly involved in this application:

"8. Provided Tabachnik, and Tabachnik and Baschuk shall not be in default in the performance of any of the terms and conditions of this agreement, for a period of five years from the date of this agreement Lamar agrees to sell and supply to Tabachnik and Baschuk, and Tabachnik and Baschuk agrees to purchase from Lamar all fabricated wire that Tabachnik and Baschuk may require in the operation of the machine referred to in subdivision (a) of Paragraph 2 of this agreement, at a price, for either nickel or brass, of the cost thereof to Lamar, plus ten cents ($.10) per pound, F. O. B. Lamar's plant in New York City. The purchase price shall be paid to Lamar before delivery thereof to a common carrier for shipment to Tabachnik and Baschuk, and delivery of such wire to a common carrier, addressed to Tabachnik and Baschuk, at the address given by it in Mexico, shall constitute good delivery. Such delivery shall be made within thirty days from the date of the receipt by Lamar of orders therefor from Tabachnik and Baschuk in quantities of approximately 100 pounds per working day, but no more. Since such wire is rolled on metal spools, Tabachnik and Baschuk shall pay to Lamar $6.00 per spool, which sum shall be refunded to Tabachnik and Baschuk when such spools are returned to and received by Lamar."

"13. Lamar shall not be liable because of late or non-delivery due to, occasioned or caused by, war, strikes, lockouts, riots, fires, the elements, embargoes, failure of carriers, acts of God or of the public enemy, or of any other cause whatsoever beyond its control, whether or not similar to the foregoing, nor in any event for consequential damages."

Significantly, paragraph 9 of the agreement was stricken out before execution. That paragraph stated that defendant should not be required to sell or supply to plaintiffs the supplies and wire referred to in paragraph 8 if to do so would in any way interfere with the operation of defendant's plant.

The proof undisputedly shows that the defendants have continued to make machine wire, similar to that agreed to be sold to the plaintiffs, in increasing quantities ever since the agreement and until April 1, 1942, when it says it ceased so to do under an order of the War Production Board. The answer admits this in substance, and the moving affidavits uncontradictedly show it to be so.

There is no doubt in my mind that the agreement to supply the wire, without which the machines sold to the plaintiffs were useless, was made to induce the plaintiffs to purchase the machines. And it is further obvious that the defendant clearly contracted to deliver what the plaintiffs required and that the purchase of wire by the plaintiffs was restricted to that fabricated by the defendant.

On the date when the agreement was made, plaintiffs gave defendant an order for 8,000 pounds of wire, and again on November 27, 1940, a further order for 10,000 pounds, both of which orders were accepted. Deliveries were agreed to be made within thirty days of the order, at the rate of not more than one hundred pounds per working day, and defendants have entirely failed to comply with their agreement in that respect. The only shipments made were as follows:

| | | |
|---|---|---|
| May 3, 1940 | 374 | pounds |
| May 3, 1940 | 1,252 | " |
| May 3, 1940 | 413 | " |
| May 3, 1940 | 904½ | " |
| Sept. 3, 1940 | 1,723 | " |
| Feb. 19, 1941 | 799½ | " |
| Apr. 8, 1941 | 798½ | " |
| Apr. 29, 1941 | 799½ | " |
| Aug. 19, 1941 | 368 | " |
| Sept. 8, 1941 | 781 | " |

Total 8,213 pounds

Had shipments been made as agreed on the basis of a five day week, the first 8,000 pounds would have been shipped not later than the end of June, 1940, and the other 10,000 pounds not later than the end of April, 1941.

It is obvious that the defendant has made no real effort to comply with its contract. The uncontradicted facts show that instead it has used up the wire fabricated by it for its own purpose, and, it can be fairly assumed, for its profit. The result

has been the impairment, if not destruction, of the business of the plaintiffs, for the forwarding of which the machine was purchased by the plaintiffs and sold by the defendant.

The defendant's opposition to this motion is based upon two contentions, (1) that the plaintiffs have not performed their part of the contract relating to payment for wire ordered and delivered, and (2) that by the orders and regulations of the United States Government, a license was required to export this wire to Mexico and an embargo has been placed upon its production and sale.

■ As to the first contention, the defendant points to subdivision 8 above quoted, by which plaintiff is required to pay the purchase price before delivery of the wire to the common carrier. This provision does not require payment upon placing of the order, but only before delivery to the carrier. To accomplish such payment, it seems entirely proper that the defendant should notify the plaintiffs that the wire is ready for delivery. That provision certainly does not require payment before such notice, nor before the wire was ready for delivery. There is no claim that any such notice ever was given. The uncontradicted proof is that payment was never required until after the wire had been shipped. There is no claim that any bills remain unpaid. And there is no showing that the present contention was ever made before this suit was brought or as a reason for not shipping any more wire; nor that the shipments would not be made unless payment was made in advance.

■ There is a dispute whether a license to export was ever required. But it is uncontradicted that on the only occasion when a license was requested (and that request was made by defendant on March 18, 1941), the defendant was advised that no license was required. The Administrator of Export Control on October 2, 1941, and the Department of State on October 7, 1941, ruled that the wire in question could be exported to Mexico under a general license. Inasmuch as the ob-

ligation to ship was upon the defendant, the obligation to procure a license was also upon it, as it seemed to recognize on the only occasion when an application for one was made. Defendant's contention that licenses have been required since April 15, 1941, and that shipments were thereafter improper without one, is obviously contradicted by the fact that four shipments were made by it since that date. This contention, like its contention as to payment, is obviously an afterthought in an attempt to excuse the defendant's flagrant and persistent breach of its own contract. It was not urged, prior to the commencement of this litigation, as any reason for not making shipments.

■ Attention is called to conservation order of the Office of Production Management No. M–9–c, which curtailed the use of copper between the period October 15 and December 31, 1941, and during each three month period thereafter. This order merely limits production to 70% of the total amount of copper and copper alloy used during the last three months of 1940. It is no excuse for failing to ship or for failing to comply with the terms of the contract. It was not urged prior to this litigation as any such excuse and does not seem to have prevented the defendant from fabricating this wire for its own purposes.

■ Finally, attention is called to the limitation order No. L–68 effective April 1, 1942. This action was commenced on December 10, 1941. The order cannot affect defaults which occurred long prior to its effective date. What effect it may have on the damages sustained by the plaintiffs may be considered when those damages are sought to be proven.

I can see no defense to the breach of contract obviously committed by the defendant. Summary judgment is, therefore, directed in favor of the plaintiff, with costs. The damages suffered by the plaintiffs under the contract shall be ascertained by a Special Master to be appointed. No injunction will be allowed.

Settle order and interlocutory judgment on notice.