**SCHNEIDERMAN et al. v. UNITED STATES.**

No. 47706.

United States Court of Claims.

Decided Nov. 7, 1950.

A. Alvis Layne, Jr., Washington, D.C., for plaintiffs. Harris, Sacks & Subrin, Akron, Ohio and Posner, Berge, Fox & Arent, Washington, D. C., were on the briefs.

Kendall M. Barnes, Washington, D. C., with whom was Asst. Atty. Gen. H. G. Morison, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

JONES, Chief Judge.

This is an action for damages which, plaintiffs claim, were caused by the failure of the War Assets Administration to de-

liver certain wrench sets which the plaintiffs claim it contracted to deliver to them.

In 1946 the War Assets Administration was conducting what was known as a spot sale at the Lordstown Ordnance Depot, Warren, Ohio. The surplus items were on display at marked prices fixed by the War Assets Administration. One of the items was a tire-changing wrench set for use on trucks or other vehicles with heavy tires. The set was marked for sale at the wholesale price of $2.00 each. The plaintiff, Louis Schneiderman, who visited the Depot on May 14, 1946, was advised that approximately 8,100 of these sets were available. Whereupon he, acting in behalf of the partnership, contracted to purchase the 8,100 wrench sets from the defendant, by executing four purchase orders.

The purchase orders were made out on the printed War Assets Administration forms and executed by the plaintiff. On each form was a space for designating the class of business in which the purchaser was engaged. Plaintiff filled in these spaces with the statement that the Myers Tire Supply Company was a wholesaler.

Among other things, the purchase order also contained the following: "The Government also reserves the right to withdraw from sale any property prior to the removal thereof without incurring any liability except to refund to the purchaser any amount paid with respect to such property."

The purchase orders also contained the following statement in solid capital letters:

"I HEREBY CERTIFY THAT I AM A WHOLESALER OR JOBBER OF THE TYPE OF MERCHANDISE ORDERED HEREWITH. I FURTHER CERTIFY THAT THIS MERCHANDISE, IF SOLD TO ME IN COMPLIANCE WITH THIS ORDER, WILL BE BROKEN DOWN AND OFFERED FOR SALE TO RETAILERS IN SUCH ASSORTMENTS AND QUANTITIES AS ARE NORMALLY OFFERED FOR SALE TO THIS CLASS OF TRADE."

Plaintiff delivered the four signed orders to a clerk who checked the stock records to see if the items were available whereupon plaintiff paid the full purchase price of $2.00 each for the 8,100 wrench sets.

A few days later the plaintiffs received by mail two documents from the War Assets Administration which were entitled "Authority to Remove Property". These documents listed the 8,100 wrench sets and were signed by Francis A. Peterlin, the defendant's sales representative at the Lordstown Ordnance Depot. Peterlin had direct authority to issue such documents.

Upon receipt of these authorizations, one of the plaintiffs upon inquiry at the Lordstown Depot was advised that the goods plaintiffs had purchased were available to be picked up by the plaintiffs. A trucker was authorized by the plaintiffs to transport the goods from Lordstown to Akron. The truck driver signed a receipt for 5,500 wrench sets and picked up one truckload containing a portion of this number. On account of the weight of the sets, the plaintiffs on May 20, 1946, made arrangements to have two freight cars spotted at Lordstown for removing the balance of the sets to Akron. One of these cars was loaded and delivered to plaintiffs. The total number thus hauled by car and truck was 2,500.

A short time prior to May 14, 1946, a Mr. Locketts, representing the Automotive Parts Company of La Crosse, Wisconsin, had visited the same Lordstown Ordnance Depot and had ascertained that the War Assets Administration had a total of 8,100 of the Jari shock wrench sets on hand. He had not talked to Mr. Peterlin who was the head of that office and he did not purchase any of the sets at that time. He did talk with other representatives of the defendant at the Ordnance Depot and indicated that he intended to purchase the entire lot of 8,100 shock wrench sets.

On May 20, 1946, the War Assets Administration at its Lordstown Depot received from Mr. Locketts a purchase order dated May 17, 1946, for 8,000 of such wrench sets including a check in payment of the order. One of the inventory clerks checked the order and informed Mr. Peterlin that all of the wrench sets had been

sold to plaintiffs. Upon investigation, Mr. Peterlin found that 2,500 of the wrench sets had already been delivered to the plaintiffs.

Mr. Peterlin examined the display card in the salesroom. The card gave the wholesale and retail prices per unit, and also provided spaces to be filled in showing the minimum and maximum quantities to be sold wholesale and retail. At the time plaintiffs purchased the wrench sets the prices had been filled in, but the other spaces had not. When Mr. Peterlin examined the cards on May 20, the statement "500 Ea." had been typed in the space containing the legend "Maximum Quantity." Mr. Peterlin had authority to prescribe such limitations at the Lordstown Ordnance Depot and had delegated this authority to employees who also established the prices at which various items were offered for sale.

Upon completion of the investigation, Mr. Peterlin felt that the sale of the entire inventory of wrench sets to plaintiffs violated the spirit of the Surplus Property Act, 50 U.S.C.A.Appendix, § 1611 et seq., which, as he interpreted it, called for the widest possible distribution. He stopped delivery of the remaining 5,600 wrench sets that had been purchased but not yet picked up by plaintiffs.

Mr. Locketts' purchase order and check were returned to him.

On May 21, 1946, Mr. Locketts returned to the Lordstown Depot and again conferred with Mr. Peterlin. Accompanying Mr. Locketts was a Mr. Ward of Jari Products Inc., the manufacturer of the wrench sets. They informed Mr. Peterlin that Locketts had submitted his purchase order with the intention of reselling the 8,000 wrench sets to the Jari Products Company, Inc. Mr. Peterlin then made arrangements to sell to Jari Products Inc., 2,500 of the Jari shock wrench sets. He decided that the balance of approximately 3,000 should be reserved for priority purchasers.

When the plaintiffs learned of this action, they were naturally disturbed. One of them telephoned Mr. Peterlin who confirmed the action. The plaintiffs then protested the refusal to deliver the balance of their order and discussed the matter with the Regional Sales Manager of the War Assets Administration, and with a representative of the Compliance and Enforcement Office of that Administration. Plaintiffs were advised that the dispute would have to be submitted to the Regional Counsel of the War Assets Administration in Cincinnati, Ohio.

During these discussions, which evidently covered a broad field, the plaintiffs pointed out that the sale to Jari Products Inc., exceeded the limit which the defendant claimed it had established. Thereupon the Regional Sales Manager of the Administration informed Mr. Peterlin that he disapproved the proposed sale to Jari Products Inc., stating that the situation created by the original error of selling more than the maximum quantity to plaintiffs could not be remedied by a subsequent sale of an equal number to the manufacturer. None of the wrench sets were sold or delivered from the Lordstown Ordnance Depot to Jari Products Inc.

Adopting the suggestion made to them, plaintiffs presented their claim to the Regional Office of the War Assets Administration who advised plaintiff's attorney by telephone and by letter that no additional wrench sets would be delivered to them. Plaintiffs had received refund checks but they did not cash them until sometime after September 23, 1946.

During August 1946 one of the plaintiffs and his attorney conferred with the General Counsel of the War Assets Administration in Washington, D.C., regarding the defendant's refusal to deliver the balance of the wrench sets that had been purchased on May 14, 1946. The General Counsel advised plaintiffs that the matter had been referred back to the Regional Counsel in Cincinnati and on the same day the General Counsel of the War Assets Administration in Washington, D.C., wrote the Regional Counsel and suggested that he undertake to settle the controversy by withholding 25 percent or 2,017 of the original

lot of wrench sets for priority claimants and delivering the balance of 3,552 sets still on hand to plaintiffs on condition that they execute a written release relieving the War Assets Administration from any further liability.

One of the plaintiffs and his attorney met with the Regional Counsel on September 21, 1946, and arrived at a settlement of the dispute on the terms suggested by the General Counsel. A written release containing the terms of the settlement was thereupon prepared and was executed by Louis Schneiderman on behalf of the plaintiffs. The Regional Counsel suggested that plaintiffs cash the refund checks and issue a new check for the 3,552 wrench sets when these were picked up at the Lordstown Depot. Plaintiffs thereupon cashed the refund checks. The Regional Counsel supplied plaintiffs with a copy of a letter of the same date which he addressed to a representative of the War Assets Administration at the Lordstown Depot directing that 3,552 wrench sets be turned over to the plaintiffs upon payment by them of the purchase price of $2.00 each.

The plaintiffs appeared at the Lordstown Depot of September 27, 1946, and offered to take delivery of and pay for the 3,552 wrench sets but the War Assets Administraction refused to deliver any of such wrench sets to plaintiffs. This refusal was based on a telegram which was sent by the Washington, D.C., office of the War Assets Administration to the Lordstown Office on September 26, 1946, as follows: "CONFIRMING YOUR TELEPHONE CONVERSATION THIS MORNING WITH MR. E. J. MASON FREEZE IMMEDIATELY ALL WRENCHES WHEEL LUG NUT FEDERAL STOCK NUMBER 41—3830 UNTIL FURTHER NOTICE FROM THIS OFFICE. UNDER THIS FREEZE NO PRIOR SALES OR OBLIGATIONS SHALL BE HONORED."

Thus came another refusal to deliver after extended effort and final settlement agreement on the basis suggested by the General Counsel of the War Assets Ad-

ministration. For the second time the wagons came back empty after instructions to appear and pick up the wrench sets.

This came as a surprise to plaintiffs. They were apparently convinced that someone in the Government was playing hide and seek with them. While protesting earnestly, they exercised admirable restraint in spite of the delay, expense, and aggravating circumstances.

Perhaps they recalled that the maker of proverbs had said in a time remote that "he that ruleth his own spirit (is better) than he that taketh a city." They, however, did ask why; why had the Government refused to honor the compromise agreement? That question apparently couldn't be answered without another huddle. No one at Lordstown seemed to know.

The Lordstown office of the War Assets Administration being unable to advise plaintiffs as to the reason for the defendant's refusal to deliver the wrench sets, plaintiffs telephoned and wrote to other officials of the War Assets Administration endeavoring to ascertain the reasons for such refusal. During the month of October plaintiffs were told why the sets were not delivered to them and this was confirmed in writing by letter dated January 15, 1947, from the Deputy Administrator, as follows:

\* \* \* \* \* \*

"The act of your company in reselling 2,000 of the 2,500 wrench sets which it had received, to the Ken-Tool Mfg. Company, a manufacturer, was a violation of your certifications in said purchase order that this property would be resold to retail dealers. This certification was one of the material conditions of that sale, predicated upon the intent of Congress as clearly expressed in the Surplus Property Act.

"Confirming the oral notice previously given to your company, you are hereby advised that because of your breach of contract, this Administration has canceled the delivery of the balance of these wrench sets."

At the time of the original purchase of the 8,100 wrench sets, plaintiffs had planned

to dispose of them through a nation-wide advertising campaign and by circulars distributed to plaintiffs' regular accounts throughout the country. When the defendant, however, stopped shipment of the balance of the order after the 2,500 sets had been delivered, plaintiffs decided they did not have a sufficient quantity of the sets to warrant the expense of such advertising.

On July 19, 1946, plaintiffs sold 2,000 of the wrench sets obtained from the defendant to the Ken-Tool Manufacturing Company of Akron, Ohio, a concern which specialized in tire-changing tools. The sale was made at a unit price of $4.65. The remaining 500 sets were disposed of to plaintiff's regular accounts.

During the war the manufacturer's entire output of wrench sets, with the exception of those which failed to meet Government specifications, was sold to the Army at a price of $6.49 each delivered to any destination specified by the Army.

The wholesale market value of the shock wrench sets on May 21, 1946, was $8.025 per set, f. o. b. Minneapolis, Minnesota. The addition of 17½ cents freight differential increased that amount to the sum of $8.20 per set. The wholesale market value of shock wrench sets on September 27, 1946, was $8.43 per set, f. o. b. Minneapolis, Minnesota, with a 19 cent freight differential or a total of $8.62 per set.

Plaintiffs claim that they are entitled to the difference between the contract price of $2.00 per set and the wholesale price on May 21, 1946, on 5,600 sets which the defendant had declined to deliver, or in the alternative, the difference between the $2.00 contract price and the wholesale market price on September 27, 1946, on the 3,552 wrench sets which the defendant refused to deliver pursuant to the compromise settlement on September 27, 1946.

It may be added that plaintiffs claim in their petition that they were entitled to the difference between the contract price and the retail price on the respective dates, but we hardly think this phase of the claim can be taken seriously.

■ We conclude that since the defendant specifically reserved the right to withdraw from sale any property prior to the removal thereof without incurring any liability except to refund the purchase price, the plaintiff cannot recover for the full 5,600 sets notwithstanding the contract for such delivery. The sale of vast quantities of surplus material on a widely distributed basis, perhaps justified the Government in safeguarding itself against liability that otherwise would have been incurred in a hurried disposal of tremendous quantities of surplus materials.

Nevertheless, under the circumstances of this case, the plaintiffs were put in a difficult position and had a real basis of complaint. Both the regional and general office officials evidently realized this and undertook to arrange a settlement of the entire controversy. It seems to us that both the plaintiffs and defendant at that time agreed on a fair and reasonable settlement and since both the law and commercial practice look with favor upon an amicable settlement of controversies, it should have been carried out in good faith.

■ The only excuse offered by the defendant for not carrying out the compromise settlement was the fact that plaintiffs had sold 2,000 of the wrench sets to one concern rather than through the regular retail trade as had been anticipated. We think that in all the circumstances the plaintiffs had reasonable grounds for taking the course which they did. The per unit advertising and circularizing expense would have been materially increased with the smaller number of sets to be distributed. Certainly the plaintiffs should not have been expected to assume this additional burden with no corresponding benefits. At any rate, this sale had been made sometime before the final settlement and the facts could have been easily ascertained. We think the plaintiffs are entitled to recover for the 3,552 wrench sets which the defendant refused to deliver in accordance with the compromise settlement.

■ We do not think, however, in the light of this record, that plaintiffs are entitled to the difference between the contract price and the wholesale price established by the manufacturers for new sets for the

period covered by the date September 27, 1946. This was surplus property. The record does not show just how long it had been in stock, but certainly these sets could not be sold on the same basis as the manufacturer's new product. Plaintiffs evidently realized this when they sold the 2,000 sets to the Ken-Tool Manufacturing Company at $4.65 per set.

We conclude in the light of the record that the plaintiffs are entitled to recover from the defendant the difference between the contract price of $2.00 per set and the price at which they had a short time theretofore sold the 2,000 sets, which was $4.65 per set. They are, therefore, entitled to recover the difference between $2.00 and $4.65 for the 3,552 wrench sets, or $9,412.80.

It is so ordered.

HOWELL, MADDEN, WHITAKER, and LITTLETON, JJ., concur.