Whitaker, Judge,
delivered the opinion of the court:
This is an action to recover damages for the alleged breach of a contract between defendant and plaintiff’s assignor, under the terms of which the Office of Foreign Liquidation Commissioner, Department of State (hereinafter referred to as OFLC) agreed to sell and plaintiff’s assignor agreed to purchase SO surplus Government aircraft. Plaintiff also seeks to recover just compensation for 10 of the aircraft which he alleges were delivered to him under the contract and then repossessed by defendant.
Defendant denies liability because it says its refusal to perform its contract was a lawful exercise of its sovereign power, for which it is not liable to respond in damages.
Plaintiff and Victor M. Oswald on May 14, 1947, entered into an agreement to purchase in Mr. Oswald’s name certain surplus aircraft which defendant had on hand in Europe, and to share all profits resulting from the transaction. Pursuant thereto, on May 21, 1947, a contract was entered into between a representative of OFLC and Mr. Oswald for the purchase of fifty UC-64A type aircraft. The contract provided, inter cilia, that the price of the aircraft would be $150,000, payable in $30,000 installments, the first payment to be made 15 days after the signing of the contract. Upon the receipt of the first $30,000, the OFLC was to deliver 5 of the aircraft to the purchaser. Upon the delivery of the fifth plane the purchaser was to pay a second $30,000 to the OFLC, which was then to deliver 10 more planes, bringing the total delivered to 15. Upon the delivery of the fifteenth plane the purchaser was to make a third payment, after which he was to receive 10 more planes, bringing the total to 25. After his fourth payment, the purchaser was to receive another 10 planes, bringing the total to 35, and for his fifth and final payment the purchaser was to receive the last 15 of the aircraft, making up the total of 50 planes contracted for. Schedule A attached to the contract listed fifty UC-64A aircraft by serial number and engine number and stated that they were located at Oberpfaffenhofen, Germany. The contract further provided that all property was sold “as is” and “where is.”
*4 The initial payment of $30,000 was made by Mr. Oswald sometime between June 10 and 15,1947. Although, the sales were made on an “as is” and “where is” basis, the Air Force decided, for reasons of safety, to sufficiently recondition each plane so that it might be flown out of the occupation zone to a point designated by the purchaser. The first 5 planes sold under the contract were delivered in this manner, the first 2 being delivered in Paris, as directed by the purchaser, on August 16 and September 15, 1947, and the last 3 being delivered in Amsterdam on about March 16, 1948.
Late in 1947 or early in 1948, Mr. Oswald became dissatisfied with the slow rate of deliveries and assigned his interest in the contract to the plaintiff. The OFLC recognized that assignment and continued to deal with the plaintiff as the contracting party throughout the remainder of the contract.
At all times material to this proceeding the United States Civil Aeronautics Authority (hereinafter referred to as the OAA) required that each American owned and operated aircraft, whether located in this country or in Europe, be registered with the CAA and thereafter be identified by the registration or NC number assigned to it. Also, before his plane could be operated, the owner had to receive a certificate of airworthiness from an authorized agent of the CAA who had inspected the aircraft. In accordance with this procedure plaintiff applied for registration and received in his name NC numbers and certificates of airworthiness for the first five planes delivered under the contract.
In March 1948, plaintiff entered into negotiations with a Mr. Tursz-Fredkens for the sale of some of the aircraft listed in his contract with the OFLC. Tursz-Fredkens represented himself to plaintiff as a Belgian national residing in the Belgian Congo, and as the representative of Somaco, a Belgian firm located in Brussels, Belgium, and indicated that Somaco desired the planes for export to the Belgian Congo. The negotiations led to a contract between plaintiff and Somaco under the terms of which plaintiff agreed to sell Somaco 20 of the planes at a price of $6,500 each, for which Somaco paid plaintiff $130,000. Thereupon plaintiff delivered to Somaco the first five planes which he had received from the OFLC.
On April 5, 1948, plaintiff made the second payment of *5 $30,000 to the OFLC. However, because of the slow rate of delivery of the first five planes delivered, and in an effort to expedite future deliveries, plaintiff arranged with the OFLC to have the planes repaired and tested at Oberpfaffen-hofen by persons employed by him, so that the planes could receive certificates of airworthiness before being moved. Accordingly, upon receipt of that payment the OFLC issued a disposal document authorizing the release of 10 more aircraft, and the 10 aircraft specified in the document were then separated by the OFLC representative at Oberpfaffenhofen from the remaining aircraft, placed in a separate position on the field, and made available to plaintiff so that he could do the work on them necessary to prepare them for flight.
After the necessary work had been completed at plaintiff’s expense, on or about May 19, 1948, certificates of airworthiness and registration numbers for the 10 planes were issued by the CAA at Oberpfaffenhofen. Between June 8 and June 15, 1948, the 10 planes were flown to Amsterdam by pilots employed by plaintiff and were there turned over to Somaco.
On May 26, 1948, plaintiff made the third payment of $30,000 as required by his contract. The next day the OFLC transmitted to Oberpfaffenhofen a disposal document covering 10 more planes; the OFLC representative notified the Air Force of its receipt, and it moved the second group of 10 planes into position, so that plaintiff could begin work on them. This work began on or about June 14, 1948, and was substantially completed by the latter part of June 1948. The planes were in the process of being test-flown for final CAA approval as to their airworthiness when the OFLC representative at Oberpfaffenhofen received instructions from the OFLC in Paris to suspend further deliveries to plaintiff.
Although the plaintiff had substantially completed all work necessary to have the second group of 10 planes flown out of the German military zone, further work on the planes was suspended and plaintiff was not permitted to remove them.
Defendant alleges it was justified in doing so because of the following:
*6 About the middle of June 1948, the United States Civil Air Attaché in Paris was told by a CAA inspector that he had seen a picture in a London pictorial review, The Sphere, showing aircraft in Nome which bore NC registration numbers that had been assigned to plaintiff, and that the caption under the picture stated that the aircraft were reportedly destined for Palestine. The Civil Air Attaché reported the matter to the Department of State, which instructed him to suspend further deliveries of aircraft to plaintiff until further notice. This action was taken, because about the time when plaintiff’s assignor executed the qontract with the OFLC an armed conflict broke out between an Arab Government and the Israeli Government in the Middle East, and shortly thereafter the United States had agreed to a United Nations Security Council resolution condemning the sending of men or materials of war (including aircraft) to either side. However, it was never determined whether the aircraft were actually bound for Palestine or whether any of them actually arrived there.
On June 23,1948, the Civil Air Attaché in Paris questioned plaintiff about the picture. Plaintiff told the Attaché that he had sold 20 planes to Somaco, for use in the Belgian Congo, 15 of which had been delivered, but that he knew nothing about any of them having been flown to Rome, or about any being destined for Israel. The plaintiff showed the Attaché a copy of his contract with Somaco and a letter from Somaco tending to confirm his statement that the planes were for use in the Belgian Congo. The Air Attaché made inquiry of the Belgian Foreign Office about the company known as Somaco. That office reported that a company bearing the name Somaco was registered at the address given by plaintiff in Brussels, but that it had not been able to find out much about its activities.
So far as the record shows, the only confirmation of the article in the London paper is that on June 30, 1948, the American Embassy at The Hague advised the Civil Air At-taché that the Embassy had been told by a Fred Lewis (who also called himself Tursz-Fredkens) that he was the European representative for aviation purposes for the State of *7 Israel and that he had chartered some of the aircraft which Somaco had obtained from plaintiff.
The Attache in Paris told plaintiff that upon the sale of planes to Somaco he should have canceled their registration with the CAA. Plaintiff stated that he had not known this but that he would be glad to do so, and on July 2, 1948, he wrote the CAA in Washington requesting cancellation of the registration numbers for the 15 planes delivered to Somaco.
On July 5, 1948, plaintiff wrote Somaco that some new arrangement would have to be made as to the five planes not yet delivered and that permission would have to be obtained from the American State Department before they could be flown to the Belgian Congo, in default of which the contract would have to be canceled or terminated.
Plaintiff attempted to have the suspension of deliveries to him withdrawn, but was advised by the OFLC office in Paris that the matter was in the hands of the State Department in Washington, D. C. Plaintiff then went to Washington in October 1948, and entered into negotiations with various individuals in the State Department for the resumption of deliveries under the contract. As a result, the State Department prepared an amendment to the original OFLC contract, which was signed by the Acting Foreign Liquidation Commissioner and by plaintiff on November 23, 1948. In this amendment the plaintiff agreed that he would not lease, sell, or otherwise dispose of any of the remaining undelivered aircraft without the prior approval of the Department of State.
On the same day that the amendment was signed, the State Department advised the OFLC in Paris of its action. Plaintiff returned to Paris during the first week in December 1948. However, he was refused a military permit to enter Germany, and the OFLC declined to resume operations under the amended contract. This action seems to have been induced by the following circumstance:
On July 13,1948, Joseph James, who had previously been employed by plaintiff in connection with the work on the planes at Oberpfaffenhofen, flew one of the planes which had been delivered to Somaco from France to Brno, Czechoslovakia. This was done at the request of Tursz-Fredkens, *8 but without plaintiff’s knowledge. The Civil Air Attache in Paris learned of this flight at about the time plaintiff returned to Paris from Washington and he also learned that five other planes sold by plaintiff to Somaco had taken off from France bound for Czechoslovakia at about the same time. The flight plans for all of these trips showed plaintiff to be the owner of the planes. The Attache questioned James, who stated that he had made the flight while under instructions from the plaintiff. However, he later repudiated this statement and absolved plaintiff of any knowledge or connection with the flight.
Since the Communist coup had occurred in Czechoslovakia prior to the flights mentioned above, the Civil Air Attache reported the incidents to the Department of State, and the Embassy at Paris recommended that no additional aircraft be made available to plaintiff. As a result, plaintiff was not allowed to resume operations under the amended contract, although he returned to Washington and spent considerable time attempting to have the suspension lifted.
When the matter was brought to the attention of the Under Secretary of State, he informed the Foreign Liquidation Commissioner in Washington, who was an official of the State Department, that it would be inconsistent with the foreign policy and contrary to the national interest of the United States to make any further deliveries to plaintiff. On February 28, 1949, the Foreign Liquidation Commissioner advised the plaintiff of this decision, and tendered him a release for his signature, so that the funds paid by plaintiff in excess of the price of aircraft delivered could be refunded. Plaintiff refused to sign the release, but on May 20,1949, the OFLC refunded $45,000 to plaintiff, which he accepted under protest and without prejudice to his rights. The $45,000 represented the amount plaintiff had paid in excess of the price of the first 15 planes delivered.
On May 18, 1949, the OFLC sold the UC-64A aircraft remaining at Oberpfaffenhofeii to the [Republic of Italy. Under the contract of sale the purchaser agreed not to dispose of the planes to any third party without the consent of the United States and to use the planes only to obtain spare parts.
*9 Plaintiff says that defendant, in canceling his contract with the OFLC, breached its contractual obligations and became liable to him for the resulting damages. Defendant says that it is not liable for the breach because it was required to prevent violation of the foreign policy of the United States.
To whatever extent the United States may be entitled to dishonor its contractual obligations with impunity, we are of opinion that the facts of this case did not justify it in doing so.
The evidence does not show that plaintiff ever attempted to violate the defendant’s policy of withholding war materials from the Israeli and Arab Governments. The most that it does is to indicate that the party to whom plaintiff resold the planes might fly them to Israel, and was possibly in the process of doing so; or that it was flying them to countries under the domination of the Soviet Eepublic of Eussia. But it fails to show that plaintiff had anything to do with this, or even that he knew that this was to be done when he resold the planes.
Before the sale of 20 of the aircraft to Somaco, a Belgium firm, this company had represented to plaintiff that it was purchasing them for use in the Belgian Congo. There is no evidence to show that plaintiff had any reason to question the truth of this representation. Once the planes had passed into the hands of Somaco, plaintiff had no further control over them. Thus, even if some of the planes did eventually get into the hands of the Israeli Government, which is not clear from the evidence, plaintiff was in no way responsible.
The contract contained no restriction on plaintiff’s right to resell the planes.
But, irrespective of this, plaintiff’s actions after he learned of Somaco’s questionable activities clearly indicate that he had no intention of attempting to violate defendant’s policies. He wrote Somaco stating that he would not deliver the five planes still due Somaco under the contract unless permission of the State Department to ship the planes to the Belgian Congo could be obtained, and he immediately canceled the registration of the planes sold when informed of the rules requiring that this be done. And, furthermore, at the demand of the State Department in Washington, he *10 signed an amendment to the original OFLC contract in which, he agreed not to dispose of any more planes to anyone without prior approval of the State Department.
Despite all of plaintiff’s efforts to assure the defendant that its policy would not be violated, the State Department canceled his contract with OFLC on the ground that further deliveries of planes to him would be contrary to the national interests of the United States.
We think no one would say that under the circumstances of this case the defendant could do what it did with impunity. Plaintiff’s contractual rights have been violated to his damage, and the defendant may not escape liability on the excuse that the breach was the result of a sovereign act.
Defendant relies on the case of Samuel Derecktor v. United States, 129 C. Cls. 103, cert. granted, 348 U. S. 926. In that case a majority of this court held that when the State Department has probable cause to believe that the Government’s foreign policy may be violated if the Government performs a contract with one of its citizens, the Government may breach the contract without liability. Two of the judges of this court dissented on the ground that the Government cannot make a promise and then break that promise without paying the damages caused the other contracting party, even though it may be deemed necessary to break the promise for fear some international policy might be violated. The Supreme Court granted certiorari, but the parties reached a settlement before that Court had an opportunity to consider the problem.
It is not necessary to resolve the dispute in this case, for even under the view expressed by the majority in the Derechtor case, the defendant cannot escape liability in this case, because the action of its officials was not justified by probable cause for believing that its performance of the contract would result in a violation of the foreign policy of this Government.
In order to induce the State Department to honor its agreement, plaintiff acceded to the demand — not incorporated in the original contract — that he resell the planes only to such persons as might be first approved by the State Department. This was the only demand made upon him. But plaintiff went further and notified the company to whom he had *11 already sold 20 of the planes that no further deliveries could be made to them without the approval of the State Department of its proposal to fly them to the Belgian Congo.
Plaintiff, therefore, put it within the power of the State Department to prevent a violation of its policies. But, even so, it refused to honor its solemn agreement.
This is a privilege no sovereign enjoys except in a despotic society. It is abhorrent to the conscience of free men. It cannot be tolerated under the laws or according to the morals of the American people.
Ten of the planes purchased had been delivered to plaintiff and by him had been made ready for delivery. These were repossessed by defendant. Plaintiff asks just compensation for their taking. He is entitled to recover just compensation.
Defendant contends that there was no compensable taking under the Fifth Amendment because there was no intention to take and because the taking was not for a public use. Defendant not only repossessed the 10 planes, but it later sold them to another purchaser. The intention to take for a public use is apparent. This court has held that the repossession by the United States Army Air Force of surplus property previously sold to a purchaser is a taking covered by the Fifth Amendment of the Constitution. Edward B. Turney v. United States, 126 C. Cls. 202.
Defendant took the 10 planes on or about July 1, 1948. The average fair market value of all the planes at Ober-pfaffenhofen before any work had been done on them was $5,500 as they stood. Plaintiff had spent about $700 on each of the 10 planes by the time they were taken, and could have sold them for approximately $6,200 per plane, or a total of $62,000. From this amount should be deducted the purchase price of $3,000 per plane which was refunded to plaintiff on May 20, 1949. This reduces the amount now due plaintiff to $3,200 per plane, making a total of $32,000.
Plaintiff is also entitled to recover such additional amount beyond the value of the property as the court may deem necessary and proper to compensate for the delay in payment. In the light of all the circumstances we feel that plaintiff should receive interest at a rate of 4 percent per *12 annum on $62,000 from the date of the taking on July 1, 1948, to May 20,1949, the date of the refund, and at the same rate on $32,000 from May 20,1949 to the date of payment.
Plaintiff is also entitled to recover damages for the breach of his contract by defendant for failure to deliver the remaining planes. At the time the contract was breached 25 aircraft had been delivered to plaintiff. If defendant had performed the contract according to its terms plaintiff would have received 20 more planes, making the total delivered to him 45, instead of the 50 called for in the contract, since defendant had only 45 planes of the type sold plaintiff, instead of 50. However, the contract provided that if there should be such a variation in quantity, an adjustment in the purchase price would be made on the basis of the unit price of each undelivered plane. Thus defendant is responsible only for its failure to deliver 20 planes.
The average fair market value of the 20 planes as they stood at Oberpfaffenhofen was $5,500 at the time the contract was breached. Plaintiff contracted to pay a price equal to $3,000 per plane. Thus his profit, except for the breach, would have been $2,500 per plane, or a total of $50,000. Plaintiff is entitled to recover this amount.
Plaintiff also seeks to recover $2,894.50 which he spent in connection with two round trips between Washington, District of Columbia, and Paris in attempts to have his contract reinstated. He is not entitled to recover this amount. When the contract was suspended plaintiff had the right to treat it as breached and to sue for damages. Instead, he elected to attempt to have the suspension lifted. His expenses incident thereto were spent by him on his own volition, for which defendant is not responsible.
Plaintiff is entitled to recover $50,000 as damages for the breach of his contract, and $32,000, plus an amount computed at a rate of 4 percent per annum on $62,000 from July 1,1948 to May 20, 1949, and on $32,000 from May 20, 1949, to the date of payment, representing just compensation for the taking of his property. Judgment will be entered accordingly.
It is so ordered.
LaRamoke, Judge; Madden, Judge; and Littleton, Judge, concur.