Saul FREEDMAN, d/b/a M. & E. Equipment & Parts Company

v.

The UNITED STATES.

No. 124–59.

United States Court of Claims.

July 12, 1963.

---

Gilbert A. Cuneo, Washington, D. C., for plaintiff. Jacob N. Geffen, New York City, Eldon H. Crowell and Cummings & Sellers, Washington, D. C., were on the briefs.

Glenn E. Harris, with whom was John W. Douglas, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LARAMORE, DURFEE and DAVIS, Judges.

DAVIS, Judge.

Claiming that he had a binding contract with the defendant to sell and deliver to him some surplus tanks for scrapping, the plaintiff sues because the Air Force refused to hand over this material. He seeks the gain he would have realized if the sale had been consummated.

In February 1957, the Directorate of Procurement of the Air Force's Northern Air Materiel Area for Europe (situated at Burtonwood, Lancashire, England)[1] called for sealed bids for the purchase as scrap of 450 surplus U. S. Army M–10 tanks then located at Cambridge. Neither the invitation nor the proposed contract included any restriction against exportation of the scrap from the United Kingdom, although such a limitation had previously been proposed by the State Department to the Air Force. The "Provisions of Sale" required that the tanks be completely demilitarized by melting down within a prescribed period. With respect to "removal of property", the proposal declared:

"(1) Property will be removed by rail from Cambridge at British Army expense to rail-head nearest to the Contractors site. If rail-head enters the Contractors site property will be delivered direct. If no rail-head is available at Contractors site, Contractor will be responsible for moving tanks from rail-head to own site. (2) Tanks will be removed at the rate of 30 per week over a period of 20 weeks in coordination with agreement made with British Railways."

Before bidding, the plaintiff, a United States citizen engaged in buying and selling scrap, inquired of the disposal officer at Burtonwood whether the sale was confined to English bidders and also whether the defendant would deliver the tanks to the purchaser. The disposal officer, whose function it was to specify any special conditions applicable to the disposal of this surplus material, answered that plaintiff was free to bid and that the Government would have to ship the tanks to the successful bidder. Plaintiff then indicated that he would probably resell the material on the Continent and was told "that's perfectly all right; go ahead and do it." He was advised that an export license from the British Board of Trade would be necessary, but there was no indication whose obligation it would be to obtain such permission.

1. For convenience, we shall refer to this disposal agency of the defendant as "Burtonwood."

With this advice, plaintiff submitted an offer of $403,000. During this period the controlled price for steel scrap sold in the United Kingdom was $13 per ton; at such a level the scrap obtained from the 450 tanks would have been worth only about $169,000 if sold in the United Kingdom. There were seven bidders for the entire lot; the bids of the three highest (plaintiff and two English firms) substantially exceeded the amount which they would be able to realize if the scrap had to be resold at the controlled price.

Plaintiff, as the highest bidder, was awarded the contract-of-sale on March 22, 1957, and was asked to forward the balance of the purchase price.[2] Almost immediately thereafter, the Headquarters of the Air Force in Washington realized that the valuable twin diesel engines in these surplus tanks did not have to be demilitarized, and that it would be wasteful to sell them as scrap. Burtonwood was directed to defer action on this award and on any further awards for tanks until this matter could be studied.

At about this time, plaintiff informed the contracting officer that he would probably resell the tanks to Norway and inquired about shipping. He was told that he would need a British export license. His reply was that it was the defendant's obligation under the contract to ship the material and to make the necessary arrangements. The contracting officer then asked him to make the application to the British Board and said that, if he failed, "we'll get it for you." The Board of Trade refused to consider any application by plaintiff, as a private citizen, and he sought assistance from the American Embassy, unsuccessfully. He then turned to Burtonwood and, on April 17, 1957, requested the contracting and disposal officers to help him obtain the export license; both refused. This negative position was upheld by Air Force Headquarters, which also encouraged Burtonwood to seek mutual rescission of

the sale because of the improvident inclusion of the diesel engines. If plaintiff should refuse to consent to rescission, Burtonwood was directed to cancel the agreement unilaterally. Upon plaintiff's refusal, the sale was nevertheless cancelled (late in April 1957) and his bid deposit returned. It is quite plain that the reason for this cancellation was the erroneous incorporation of the engines in the invitation.

In Washington in May 1957, during a conversation with a high Air Force legal officer, plaintiff was given this ground as the basis for the cancellation. He offered to remove the engines without cost to the defendant and to store them in bond or ship them back to England (also without cost). The Air Force official responded that, if plaintiff would agree to do all these things, the Government would reinstate the contract on those terms. Plaintiff asked about the export license and was told that this was a problem for Burtonwood to iron out. The Air Force then instructed Burtonwood to reinstate the contract, deleting the diesels and crediting plaintiff for their weight; the directive also set forth certain other conditions which the record does not reveal. On June 12, 1957, the contracting officer wrote plaintiff that the letter of April 1957 cancelling the original contract "is hereby rescinded" and that agreement "remains in force subject to the negotiated amendment thereto, which will specifically reflect that the twin diesel engines presently contained in the M–10 tanks remain the property of the United States Government."

Thereafter, at a series of conferences with Burtonwood, plaintiff offered (i) to exclude the engines from the sale; (ii) to remove them on the Continent (where he expected the tanks to be demilitarized) or, alternatively, at the English port from which the tanks would be shipped; (iii) if removal were accomplished on the Continent, to ship the engines at his own expense back to England or store them in bond (at no

2. He had already deposited $80,637.60 along with his bid.

charge) at the point of tank-demilitarization. Since he had found a potential customer for the scrap at Dunkirk, he insisted, however, that the delivery of the tanks to the Continent would have to be undertaken by the defendant at its own expense, either as the shipper or on behalf of plaintiff. This insistence was rooted in plaintiff's twin beliefs that the original contract required the defendant to deliver, and also that he himself would not receive an export license from the British Government without United States intervention. If the United States Government were the shipper, the British would certainly raise no questions as to export, and it was probable that they would honor an American request to grant a license to plaintiff.

Burtonwood would in no event agree that the Government should be the shipper or pay for delivery to the Continent,[3] and the Department of State (despite the urging of the Air Force) would not ask the Board of Trade to grant export permission to plaintiff. After some unhappy wrangling, Burtonwood informed plaintiff, in October 1957, that the prior unilateral cancellation was revived, primarily because of plaintiff's "inability to obtain a license from the British Board of Trade to export the tanks as scrap." The material was later resold (for a much lower price) under an invitation which put the costs of shipping on the purchaser and also required a British export license (which the advertisement warned was "extremely difficult to obtain") from any bidder intending to ship the property abroad.

█ The first question is whether the defendant validly cancelled the original contract because it mistakenly covered the still-useful diesel engines which were not required to be demilitarized and therefore should not have been offered as scrap. The bid-invitation and the contract contained a paragraph 11, entitled "Limitation on Government's Liability," and providing:

> "In any case where liability of the Government to the Purchaser has been established, the extreme measure of the Government's liability shall not, in any event, exceed refund of the purchase price or such portion thereof as the Government may have received."

This paragraph, as plaintiff himself emphasizes, was inserted into the standard sales form mainly to meet those instances in which (1) a need for the property develops after it has been declared surplus and offered for sale, or (2) a serious mistake has been made, such as a grave price discrepancy between the true value of the item and the amount bid.

The original contract falls squarely under the second branch of these reasons for cancellation. Very soon after the award, the Air Force discovered the error in selling the valuable engines for scrap and began efforts to withdraw from the arrangement. Plaintiff recognized that the diesels could be salvaged and that a mistake of some kind had been made; he offered to modify the contract accordingly, but he would not consent to total rescission. In these circumstances the defendant was privileged, under paragraph 11, to cancel the contract, at that time, without liability other than for return of the bid deposit (which was done). In North & Judd Mfg. Co. v. United States, 84 F.Supp. 649, 114 Ct. Cl. 355 (1949), this court applied a comparable contract clause so as to free the defendant of liability where surplus property was withdrawn, after sale, because of previously unpredictable but newly urgent governmental needs.[4] The same

---

3. A major reason for this position was that the British Army considered that its agreement with the defendant covered only (a) shipments within the United Kingdom and (b) shipments in which the United States Government was *not* the owner of the goods shipped.

4. See, also, Erie Coal & Coke Corp. v. United States, 266 U.S. 518, 520, 45 S.Ct. 181, 69 L.Ed. 417 (1925), aff'g 58 Ct.Cl. 261 (1923); Schneiderman v. United States, 93 F.Supp. 626, 630, 117 Ct.Cl. 715, 735 (1950); Silverton v. United States, 118 Ct.Cl. 232, 246–247 (1951);

principle should govern, under paragraph 11 of the plaintiff's contract, to authorize cancellation for a significant error in the items offered for sale.

The next issue is whether the original contract was reinstated, minus the diesel engines, after plaintiff saw the high-echelon Air Force legal officer in Washington. Defendant says that a second contract never emerged because the parties could not agree upon the necessary modifications incident to the deletion of the engines. We see the record differently. At his conference with the Air Force's lawyer, plaintiff was told that the sale would be reestablished if he agreed to certain conditions concerning the engines. Burtonwood's formal letter to plaintiff (dated June 12, 1957), rescinding the cancellation, declared that the earlier contract remained in force "subject to the negotiated amendment thereto"—which was described as one reflecting the defendant's continued ownership of the engines. The disposition of those items was the only point left open; in other respects the initial contract would still control without any need for a second negotiation on terms. If the engine problem were settled, the whole agreement would be automatically revived.

The fact is that the subsequent discussions did not founder in the minor shoal of the diesels but on the major difficulties already inherent in the original contract. The plaintiff went as far as he reasonably could in assuming the burden of excising the engines from the tanks, while at the same time adhering to his interpretation of the contract as requiring the defendant to deliver the tanks wherever the British Railways had a railhead (even though that point was outside the United Kingdom) and to pay for the transportation. He agreed to remove the engines in the United Kingdom or on the Continent, as the defendant wished, and if the latter location were chosen he offered to pay for the expense of shipping the diesels back to Great Britain or of storing them on the Continent. The defendant could not reasonably reject these wide-ranging concessions (see Miller v. United States, 140 F.Supp. 789, 794–795, 135 Ct.Cl. 1, 10–11 (1956)), and they were not in fact rejected for themselves. The Air Force made other demands, not truly within the subject of the engines which had been left open for further negotiation, but related rather to the matter of shipment which had been covered by the original contract. Plaintiff could not accept these demands without abandoning his construction of the delivery provisions of the original contract. The discussions collapsed over that point, not over the engines.[5]

Accordingly, we hold, on two alternative grounds, that the first contract was fully reinstated (with the engines excluded): *first,* the parties actually agreed on the engines, the only matter left for further negotiation, and parted company solely on issues no longer open for negotiation; *second,* since the only subject properly left for discussion was so narrow and the plaintiff was willing to agree to any reasonable requirement imposed by defendant, the latter could not arbitrarily refuse (as it did) to come to terms. Cf. Note, 49 Va.L.Rev. 773, 784–785 (1963); Stevens v. Howard D. Johnson Co., 181 F.2d 390, 393 (C.A. 4,

United States v. Weisbrod, 202 F.2d 629, 631–633 (C.A.7, 1953), cert. denied, 346 U.S. 819, 74 S.Ct. 32, 98 L.Ed. 345 (1953).

5. In our findings, we say (finding 25) that plaintiff's proposals did not come within the limits of certain instructions (not in evidence) which Burtonwood had received from Washington. But we also hold that these conditions, whatever they were, must have gone beyond the only subject left for further negotiation, i. e., the

disposition of the engines, since plaintiff agreed to all reasonable conditions relating to the engines. Burtonwood would not accede to plaintiff's request that his proposals be submitted to Washington.

There may have been a problem, at the outset of the negotiations on the exclusion of the engines, whether the cooling system constituted a part of the engine, but there is no reason to believe that this was a significant stumbling block.

1950); Weiner v. Pictorial Paper Package Corp., 303 Mass. 123, 20 N.E.2d 458, 462–463 (1939); Kresge v. Taylor, 194 F. 379 (C.A. 3, 1912).[6]

When the contract was reinstated, with the modification as to the engines, it carried with it the same general terms and the same meaning it originally had—whatever they may have been. This is undoubtedly what the parties intended at the time plaintiff spoke to the Air Force legal officer and the defendant sent its letter of June 12, 1957, formally notifying plaintiff of the reinstatement of the sale and the rescission of the earlier cancellation. That letter, as we have said, can bear no other interpretation than that the contract was again put fully in force, subject to agreement on the engines. The ensuing meetings uncovered the disparity in the parties' understanding of the delivery provisions of the original contract, but by that time the contract had already been reinstated by the June 12th letter, with the proviso that an accord on the engines would have to follow. That condition subsequent was, we have held, thereafter fulfilled. The basic contract became wholly effective once more, without alteration except as to the engines.

█ We are thus required to grapple with the meaning of the delivery provision of the contract. On that pivot liability turns, for, as defendant concedes, "if the United States did in fact assume an obligation to ship the tanks outside the United Kingdom, and there to make formal delivery of them to the successful bidder," the matter of British export licenses would be irrelevant and the defendant could not urge "that its failure to deliver is excused by the difficulties plaintiff experienced with British export authorities in an attempt to obtain an export license." We agree with plaintiff that defendant must be held to have obligated itself to deliver the tanks to Dunkirk, where British Railways had a rail-head and the plaintiff had found a plant.

The "Removal of Property" clause, supra, referred generally to an "agreement with British Railways" and provided that the property would be removed "by rail from Cambridge at British Army expense to rail-head nearest to the Contractors site"; "if the rail-head enters the Contractors site property will be delivered direct"; but "if no rail-head is available at Contractors site, Contractor will be responsible for moving tanks from rail-head to own site." The natural understanding of these unqualified words would be that: (a) the defendant had an agreement with the British Railways and the British Army under which the former would deliver the tanks for the United States (but at the British Army's expense) to a rail-head at or near the contractor's site; (b) the defendant undertook in this fashion to ship and make delivery to that rail-head; (c) the contractor's site was any point chosen by the contractor to receive the goods; (d) nothing being said as to delivery being confined to the United Kingdom, the obligation would extend as far as the British Railways had a rail-head; and (e) if an export license were needed for delivery to a rail-head of British Railways on the Continent, the defendant, as part of its obligation to deliver, would either obtain the license or arrange for omission of that requirement. This was plaintiff's contemporaneous understanding of the delivery provision. It is also supported by the disposal officer's statement to plaintiff (before the bidding) that it would be "all right" for him to "wind up" with the tanks on the Continent, as well as by the contracting officer's advice (shortly after the award) that plaintiff should seek an export license and "if you don't succeed, we'll get it for you." The two other bidders who exceeded the domestic controlled price for scrap must likewise have construed the contract as authorizing export.

6. Abbell v. United States, 166 F.Supp. 602, 143 Ct.Cl. 556 (1958), in which the court held that no final agreement was ever consummated, differs in both aspects from the present case.

We cannot accede to defendant's position that the contract as a whole demonstrates the error in this reading of the "Removal of Property" clause. By themselves, the standard-form provisions that this was a "where is" sale, "f. o. b. conveyance" at the point of loading, could suggest that the Government was not bound to deliver; but those conventional clauses must in this instance yield to, and be interpreted in the light of, the specially-tailored removal-and-delivery article. See Callahan Construction Co. v. United States, 91 Ct.Cl. 538, 634–635 (1940). Nothing else in the contract demanded that the transaction be confined to the British Isles. The unspecific term "Contractor's site" (in the removal clause) can easily apply to any location designated by the purchaser, and need not be limited to a smelting place within the United Kingdom. The contract did require the successful bidder to furnish proof of smelting, within one year, to the defendant's disposal officer and to the British Customs and Excise Officer at Cambridge, but such proof could be supplied to that officer at Cambridge, whether the smelting were done in Kent or France or Belfast. Air Force personnel were to inspect the demilitarization of the tanks each week; that, too, could be done even if the plant were on the Continent or in Ireland. Stress is also put upon the transportation "by rail" promised by the defendant, but rail carriage does not exclude use of a rail-ferry (which is often a part of rail transportation). The removal article provides flatly for delivery to any "rail-head" of the British Railways at or near the contractor's site; the record shows that those Railways did maintain a rail-head at Dunkirk, serviced by a rail-barge-

ferry.[7] In short, the other terms of the agreement are consistent with what the unqualified words of the removal article imply and what plaintiff thought from the beginning, i. e., that the defendant would make delivery to a British rail-head on the Continent if that turned out to be near the location chosen by the contractor.

This is the construction of the contract we gather from its terms and background, without benefit of extraneous presumptions or special rules of interpretation. But if this reading be still considered questionable, we must resolve the doubt against the defendant as the drafter of the special removal provision; the plaintiff's understanding of that clause was wholly reasonable in the known circumstances. See, e. g., W. H. Edwards Engineering Corp. v. United States, Ct.Cl. No. 218–59, decided April 5, 1963, slip op. p. 9–10; Peter Kiewit Sons' Co. v. United States, 109 Ct.Cl. 390, 418 (1947); Western Contracting Corp. v. United States, 144 Ct. Cl. 318, 326 (1958).[8]

Once it is recognized that the Government had assumed the obligation to deliver the tanks to the rail-head at Dunkirk, the breach becomes plain—as defendant admits. The duty to ship and deliver necessarily encompassed the subsidiary duty to obtain an export license for plaintiff or to by-pass that requirement by shipping the material as the Federal Government's own. Without that secondary obligation, the primary promise would have no meaning; and the defendant was surely in a better position to fulfill its agreement by obtaining the permit (or a waiver) than plaintiff, a private American purchaser.[9] Similarly,

7. The removal clause would concededly cover a rail-ferry from England to Northern Ireland (if there is one).

8. At times, in the course of his discussions with defendant and others, plaintiff was casual and inaccurate in recounting the status of events and transactions. These defects, however, did not improperly mislead defendant, waive plaintiff's rights, or show that he is not entitled to pre-vail. His standing under this contract is not affected by his collateral conduct.

9. For various applications of the rule that the duty to obtain a license falls generally on the party to whose obligation the getting of the license most directly and appropriately appertains, see Inter-Coast S.S. Co. v. Seaboard Transp. Co., 291 F. 13 (C.A.1, 1923); Banking & Trading Corp. v. Reconstruction Finance Corp.,

the defendant, having bound itself to deliver abroad, could not refuse to take the necessary steps because the State Department felt that it was inopportune to ask the British Government for an export permit. The doctrine of "public and general" "sovereign acts", laid down in Horowitz v. United States, 267 U.S. 458, 45 S.Ct. 344, 69 L.Ed. 736 (1925), does not relieve the Government from liability where it has specially undertaken to perform the very act from which it later seeks to be excused. See Sunswick Corp. v. United States, 75 F.Supp. 221, 228, 109 Ct.Cl. 772, 798 (1948), cert. denied, 334 U.S. 827, 68 S.Ct. 1337, 92 L. Ed. 1755; cf. Stebel v. United States, 69 F.Supp. 221, 222–223, 108 Ct.Cl. 35, 44–45 (1947); Miller v. United States, 140 F.Supp. 789, 135 Ct.Cl. 1 (1956); Metal Exports, Inc. v. United States, 146 F.Supp. 951, 137 Ct.Cl. 258 (1957). In any event, it is clear that the Air Force refused to adopt the other feasible method of exporting the tanks—shipping them as property of the United States for which no license would be required—simply because the British Government would not pay for that type of transportation (see footnote 3, supra). There was no conceivable foreign policy obstacle to following that course, only a pecuniary drawback.[10] The existence of this court is proof enough that the desire to save money is a poor reason to break an outstanding promise. Cf. Lynch v. United States, 292 U.S. 571, 580, 54 S.Ct. 840, 78 L.Ed. 1434 (1934).

■ Defendant's last hope is paragraph 11 of the contract, quoted supra, which purports to restrict the "extreme measure of the Government's liability" "in any event" to a refund of "the purchase price or such portion thereof as the Government may have received." We have already ruled, earlier in this opinion, that paragraph 11 does play a valid part where the Government cancels the sale for such good cause as a newly-discovered need for the property or a significant mistake as to the property offered for sale. But we will not construe the general terms of the paragraph as absolving the Government from all damages where it breaches the contract, without such good reason, because it disagrees with the contractor over the meaning of some provision of the agreement. To read the clause in that unlimited fashion —excusing all damages for any type of breach—would come close to (if not reach) the pit of voidness; the Government would in effect promise nothing although the other party would supposedly be bound.[11] Moreover, we have held that general provisions seeming to immunize the Government from paying damages due to its own breach or negligence should be construed, if possible, as not covering serious breaches, especially willful defaults, causing important loss to the contractor. Ozark Dam Con-

---

147 F.Supp. 193, 208–210 (S.D.N.Y., 1956), aff'd on other grounds, 257 F.2d 765 (C.A.2, 1958); Tabachnik v. Lamar Slide Fastener Corp., 46 F.Supp. 699, 701 (S.D.N.Y., 1942); In re Anglo-Russian Merchant Traders, Ltd., etc. [1917] 2 K.B. 679 (C.A.); H. O. Brandt & Co. v. H. N. Morris & Co., Ltd., [1917] 2 K.B. 784; A. V. Pound & Co. v. M. W. Hardy & Co. [1956] A.C. 588 (H.L.).

In Frank v. United States, 79 Ct.Cl. 516 (1934), unlike the present case, the Government had *not* obligated itself to ship and deliver the surplus materials to a foreign point.

10. The British Government had itself sold a large number of tanks to plaintiff for scrapping, and had permitted their export (see finding 33).

11. The cases upholding clauses authorizing the Government to withdraw the goods from sale have concerned or considered withdrawals for good cause or within some defined time limit. See Erie Coal & Coke Corp. v. United States, 266 U.S. 518, 45 S.Ct. 181, 69 L.Ed. 417 (1925); North & Judd Mfg. Co. v. United States, 84 F.Supp. 649, 114 Ct.Cl. 355 (1949); Schneiderman v. United States, 93 F.Supp. 626, 117 Ct.Cl. 715 (1950); Silverton v. United States, 118 Ct.Cl. 232 (1951); United States v. Weisbrod, 202 F.2d 629 (C.A.7, 1953), cert. denied, 346 U.S. 819, 74 S.Ct. 32, 98 L.Ed. 345 (1953) (all cited supra).

structors v. United States, 127 F.Supp. 187, 190–191, 130 Ct.Cl. 354, 359–360 (1955). That admonition cautions us to exclude from the generality of paragraph 11 a significant, willful, and unjustified breach, like that present in this case, destroying the heart of the plaintiff's agreement and bringing grave loss. In such cases the normal damage rules should continue to apply.

Plaintiff's net damages have been ascertained for the most part, but not completely. He agreed, in June 1957, to sell the tanks (without the engines) to a French company near Dunkirk at $62 per metric ton, i. e., at the lower range of the then "world-wide" market price for scrap of this type. This would have brought him $669,755. If the contract with the defendant had been performed, he would have had to pay $369,136.38 as the purchase price of the tanks (less the engines). He would also have had some $35,000 in miscellaneous expenses, and another $35,380.50 in transporting the tanks (with the engines) from the Port of Dunkirk to the French company's nearby plant. That firm had agreed to remove the engines and restore them to plaintiff, but he would then have incurred the expense of either storing the engines for the defendant on the Continent for a reasonable time, or of transporting them back to England. We do not know the extent of these probable costs, and the case will therefore have to be returned to the Trial Commissioner to determine the higher of either (a) the expense of storing the engines for the defendant at or near Dunkirk for a reasonable time *or* (b) the cost of transporting the engines from the French company's plant back to Cambridge, England.[12] It is fair to charge the plaintiff with the greater of these two amounts since we have held that the original contract was reinstated only because plaintiff agreed to all reasonable demands the Air Force could make with respect to the disposition of the engines; we must as-sume that the defendant could have asked either for storage or for reshipment back to England, and that plaintiff would have paid for the costs of either election. Except for these costs, plaintiff's damages amounted to $230,238.12. The expense of storage or reshipment will be deducted from that amount.

Plaintiff is entitled to recover, and judgment is entered to that effect. The precise amount of recovery will be determined, in accordance with this opinion, under Rule 38(c).

---

12. The record reveals that it would cost almost $3,000 to transport the engines some five miles from the French com-pany's yards to the Port of Dunkirk, but we have no figures on the carriage from Dunkirk back to England.