SIGMUND KRAUTER, Respondent, *v.* JOSE MARIA DE YBARRA MENCHACATORRE and Others, Copartners, Doing Business under the Firm Name and Style of HIJOS DE YBARRA, Appellants.

First Department, July 14, 1922.

**Sales — action for breach by sellers of contract for sale of olive oil to be shipped f. o. b. Seville, Spain — refusal to ship based on failure of buyer to pay export tax imposed after contract made — buyer bound to pay export tax on all oil shipped under terms of contract after tax imposed — sellers merely required to place goods on board steamship furnished by buyer — fact that sellers assumed buyer's obligation to obtain steamer did not relieve buyer from paying tax — tax on oil which should have been shipped before tax imposed must be paid by sellers — if delay caused by strikes, etc., tax payable by buyer.**

Under a contract for the sale of olive oil f. o. b. Seville, Spain, the obligation rests on the buyer to pay an export tax on all shipments made after the tax was established, though said tax was not established until after the contract was entered into, and the refusal of the buyer to pay the tax justifies the sellers in refusing to make the shipments.

The contract did not require the sellers to ship the goods but merely to place them on board the steamship for shipment.

If it be assumed that the goods could not be put on board the steamship under the royal order establishing the export tax or under any custom of the steamship company, still it was the duty of the buyer to pay the tax.

The fact that the sellers in the present case obtained the steamer on which the oil was to be shipped and thereby assumed the burden which otherwise rested upon the buyer did not cast upon the sellers the duty of furnishing an effective ship authorized to export the oil in question and did not change the legal obligation of the sellers in case the buyer refused to pay the tax which was necessary in order to have the goods exported.

However, as to oil which should have been shipped before the export tax was established, but which was not shipped through neglect of the sellers, they are under obligation to pay the tax.

*It seems,* that if the delay in the shipment was caused by the delay of steamers or railroads, failure of crops, war, strikes, embargoes or any other causes beyond the control of the sellers, then they are not liable for the tax on the oil which should have been shipped before the tax was imposed.

APPEAL by the defendants, Jose Maria de Ybarra Menchacatorre and others, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 13th day of April, 1921, upon the verdict of a jury, and also from an order entered in said clerk's office on the same day denying defendants' motion for a new trial made upon the minutes.

*Daniel E. Hanlon* [*Anthony J. Ernest* of counsel], for the appellants.

*Isaac Steinhaus,* for the respondent.

SMITH, J.:

The only question submitted to the jury was the question of the amount of damage, the trial court holding as a matter of law that the defendants had breached their contract. This is an action brought by the buyer against a partnership in Spain doing business under the style of Hijos de Ybarra. The contract called for the purchase and sale of 750 barrels of pure olive oil of a certain quality. The shipments were to be made, 250 barrels in June, 250 barrels in July, and 250 barrels in August. There was provision in the contract that the seller should not be responsible for delays of steamers, or railroads, failure of crops, wars, embargoes, strikes, or any other cause beyond their control. The insurance marine and war risk were to be effected by the buyer.

The defendants shipped 150 barrels in July, and failed to ship any more, and it is for the breach of the defendants' contract to ship the balance of the goods that this action is brought. The evidence shows in a letter from the defendants on August 3, 1917, that a Royal Order had been issued on August second in Spain

establishing an export duty on olive oil of forty pesetas per 100 kilos. That Royal Order is not in the evidence, and there is nothing except this letter of August third to indicate the date of the Royal Order. After the issuance of this Royal Order the defendants offered to deliver the oil if the plaintiff would pay the export tax. This the plaintiff refused to do, whereupon the defendants refused to ship the oil, which refusal has been held by the court to be, as a matter of law, a breach of the contract.

The main question for consideration is as to whether the buyer was compelled to pay this tax in execution of the contract. It seems to me clear that as to the August shipment, which was to be made after the tax was invoked, the duty of paying the tax in the performance of the contract was upon the buyer. Delivery was to be made f. o. b. Seville; the title of the goods passed when the defendants had put the goods on board the steamer. The seller's duty then stopped. The actual exportation was the concern of the buyer alone. It seems to be assumed by the plaintiff's counsel that these goods could not be put on board the steamer without the payment of this tax. I find nothing in the evidence, however, showing that any such requirement was specified in the Royal Order. Under the contract the defendants were to pay the expenses of putting the goods upon the steamer. The export tax is a tax upon goods which actually go out, which actually leave the country, and would seem to fall upon the party which took them out and, in this case, the buyer was the one. Having received title at Seville, upon the loading of the goods, the export tax should properly be paid by the buyer who, thereupon, sought to take them out of the country. The contention of the purchaser seems to be that the seller was required to ship the goods. This is a general expression and simply means, when read in connection with other parts of the contract, that the seller was required to place them on board the steamship for shipment.

If we assume, however, that they could not be put on board the steamship under the Royal Order, or under any custom of the steamship company, we are still of the opinion that the duty was upon the buyer to pay this tax. In the case of *Brandt & Co.* v. *Morris & Co., Ltd.* (L. R. [1917] 2 K. B. 784) the sale was made f. o. b. Manchester. The seller was required to make known that the destination was for export. After the contract was made the export of the aniline oil, which was the subject of the same, was prohibited by an Order of Council except under license. It was provided that the goods could not be placed upon the quay for shipment before the obtaining of the license. In the opinion of Lord SCRUTTON it was held that the duty of obtaining that license was upon the buyer and not upon

the seller; that the buyer was compelled to furnish a ship which could legally export the goods, and notwithstanding that the freight could not be loaded upon a steamer until after the obtaining of the license, and that it was the duty of the seller to place them on board without expense to the buyer, nevertheless, that the seller had not breached its contract because the buyer had not obtained the license to export the same. The opinion in part reads: " The buyers must provide an effective ship, that is to say, a ship which can legally carry the goods. When the buyers have done that the sellers have to put the goods on board the ship. If that is so, the obtaining of a license to export is the buyers' concern. It is their concern to have the ship sent out of the country after the goods have been put on board, and the fact that under s. 8 of the Customs and Inland Revenue Act, 1879, as amended by s. 1 of the Customs (Exportation Prohibition) Act, 1914,* a prohibition against export includes a prohibition against bringing the goods on to any quay or other place to be shipped for exportation does not cast the duty of obtaining the license on the sellers. Bringing the goods on to the quay is merely subsidiary to the export which is the gist of the license. In my view, therefore, in a contract of this kind it is for the buyer to get the license." This case is, I think, a clear authority for holding that it was the duty of the buyer in this case to pay the tax, and even if the payment of the tax was a necessary prerequisite to the placing of the goods on board, or bringing them on the wharf, and the contract was an f. o. b. contract, nevertheless, it became the duty of the buyer to pay this tax, which is, in fact, a tax upon the actual exportation of the goods with which the seller had no concern.

It is here claimed that the seller did, in fact, obtain the steamer and assumed its obligation to obtain the steamer which, otherwise, would rest upon the buyer, and the contract is thus interpreted by the parties to cast the burden of furnishing an effective ship, authorized to export, upon the seller. It is evident, however, that the sellers, living in Spain, could more easily do this, and the fact that they assumed part of the duty of the buyer in obtaining the ship to carry the goods without contract requirement, cannot change the legal obligation of the sellers in case the buyer refuses to pay the tax which it is necessary to pay in order to have the goods exported under the contract.

This reasoning would exempt the seller from liability for the

---

* See 42 & 43 Vict. chap. 21, § 8, as amd. by 4 & 5 Geo. 5, chap. 64, § 1. See, also, Trading with the Enemy and Export of Prohibited Goods Act, 1916 (6 & 7 Geo. 5, chap. 52), § 3.— [REP.

August shipment.    I find nothing in the record, however, to show that this export tax was assessed by Royal Order prior to the first day of August.    The contract was made on March 15, 1917, while the World War was in progress.    If the sellers had performed their part of the contract in making the June and July shipments, they would have been made prior to the issuance of the Royal Order imposing the export tax upon the goods shipped.    I see no reason, therefore, why the defendants are not liable for a breach of their contract to export the amount required in the June and July shipments.    The contract for these shipments required the export of 500 barrels.    One hundred and fifty barrels only were shipped, so that the defendants would be liable for the breach of their contract to deliver the 350 barrels which under the contract should have been shipped in June and July.    If this delay were caused by the delays of steamers or railroads, failure of crops, war, strikes, embargoes, or any other causes beyond the control of the sellers, it would seem clear that the sellers were not liable for the failure even to make these shipments in June and July, but there is no evidence here upon which the court can hold that the failure to make shipments in June and July was due to any such cause.

The plaintiff has recovered for the failure to ship the 600 barrels of oil.    If the conclusion which we have reached be right, the defendants are liable for failure to ship 350 barrels.

The judgment should be reversed and a new trial granted, with costs to appellants to abide the event.

CLARKE, P. J., LAUGHLIN, DOWLING and GREENBAUM, JJ., concur.

Judgment and order reversed and new trial ordered, with costs to appellants to abide event.