**BANKING AND TRADING CORPORA-TION, Limited, also called Perseroan Bank Dan Perniagaan, Plaintiff,**

v.

**RECONSTRUCTION FINANCE COR-PORATION, Defendant.**

United States District Court
S. D. New York.
Nov. 30, 1956.

See, also, 15 F.R.D. 360.

Delson, Levin & Gordon, New York City, Robert Delson, Louis C. Bial, and Carl Slater, New York City, of counsel, Murray C. Bernays, and Ellis J. Freedman, Trial Attorneys, New York City, for plaintiff.

Charles R. L. Hemmersley, New York City, Abram Glaser, New York City, of counsel, for defendant Reconstruction Finance Corp.

WALSH, District Judge.

Plaintiff, an Indonesian corporation, claims for the purchase price of a cargo of rubber which it allegedly sold Rubber Development Corporation, a now dissolved subsidiary of the defendant, and which was confiscated by the Dutch during its attempted exportation from Indonesia. It claims that the exchange of communications between its commission merchant, Isbrandtsen Incorporated, and R. D. C. constituted a contract for the sale and that by loading the rubber on Isbrandtsen's ship in Java it completed performance under the contract. In the alternative it claims for goods sold and delivered.

Defendant denies that the contract of sale had been completed, and contends that even if it had, it was properly rescinded. Further, it denies that plaintiff's alleged performance was effective because plaintiff failed to obtain a necessary export permit as agreed by the parties. Other defenses are raised by R. D. C. but they need not be discussed.

It is my conclusion that a contract between the parties was never reached. Negotiations were suspended when the general counsel of R. D. C. told the appropriate officer of Isbrandtsen, plaintiff's agent, that R. D. C. would not proceed further with the transaction until Isbrandtsen obtained the necessary export permit. If, however, a contract had been reached, this conversation constituted an effective rescission. Further, plaintiff never performed the alleged contract. Plaintiff's agent was to obtain the export permit. Loading the rubber without any reasonable likelihood of getting it did not constitute performance in whole or in part.

The incidents relating to the transaction occurred during the first three months of 1947. At this time the Netherlands was recognized by the United States as sovereign of all Indonesia. Yet, in fact, the Indonesian Republics, who had declared their independence, controlled several of the large important islands, including most of Java. On that island, the Netherlands controlled only three small enclaves. Its navy, however, had control of the surrounding sea.

During this period a truce existed between the Republics and the Dutch and they were attempting to bring about the formation of a federated nation to include the Indonesian islands controlled by the Dutch as well as those controlled by the Republics, to be known as the United States of Indonesia. They had actually initialed an agreement looking to this end, known as the Linggadjati agreement, which was ratified one month after the conclusion of the transaction under consideration. To some extent this agreement was respected by its signatories during the period of this transaction. Upon its ratification, the United States, in accord with the Netherlands, recognized that the Republics were exercising de facto authority throughout Java except for the three Dutch enclaves.

One of the difficult problems to be worked out in the formation of the new nation was the liquidation of the holdings of Dutch individuals. Rubber was one of the products most involved. In Java almost all of it had been grown upon the estates of the Dutch. The owners had fled from the Japanese and had been unable to return before the Indonesians declared their independence and took control of these estates. To prevent the looting of these estates, the Netherlands East Indies Government, by regulation,

forbade the export of estate products, and enforced this mandate by the Netherlands East Indies navy.

In the United States the rubber trade was being gradually released by the government for return to private channels. During the war, all importation of rubber, primarily from South America, had been carried out by the government through R. D. C. This policy continued after the war until the spring of 1947. In 1946, however, as Far Eastern sources became available, the private rubber traders had been brought increasingly into the commerce. During that year and the period of 1947 in which the present transaction took place, R. D. C. negotiated overriding export-import agreements with the governments of rubber producing nations but it left to the private traders of the United States the actual arranging of transactions with their Far Eastern contacts. R. D. C. sent no agents of its own into that area. R. D C. assigned quotas to each private importer based upon its previous share of the market; it established price lists; it developed a form contract; and then it authorized its purchasing agents to accept from the private American traders whatever rubber they could get from sources in the nations having agreements with R. D. C. Each transaction was required to conform with the R. D. C. form contract, price-list and quotas. In each transaction R. D. C. bought from the American merchant, never directly from the Far Eastern shipper. For example, in the Malay states under British sovereignty, R. D. C., subject to the approval of the State Department, would have negotiated with the British for the American importation of a certain amount of rubber. American companies would then have dealt with their Far Eastern contacts to arrange for the purchase of rubber within the prices published by the R. D. C. When they were successful, they would have contracted to buy from the Far Eastern shipper and resell to R. D. C. The American merchant would have financed this shipment and would have covered these costs as part of the contract price paid to him

by R. D. C. Although not required to guarantee the quality and quantity of the shipment, the American seller would have been obligated to carry out negotiations with the Far Eastern shipper to make appropriate adjustments and he would have been paid a premium for the performance of this duty.

At the time of the transaction in question, R. D. C. was in the last stages of dissolution. Its President resigned February 1, 1947, during its pendency. The Vice-President in charge of rubber purchases was on terminal leave. The successor to the President who had come from a sister agency was generally unfamiliar with R. D. C.'s program for the importation of rubber. The officer of the Department of State who had previously served on its board of directors had withdrawn.

Rubber was still scarce. Revival of the trade with the blockaded, Republican controlled portions of Indonesia, one of the world's principal sources of rubber, would have been welcomed by the United States. Politically, however, it was our policy to maintain neutrality between the Dutch and the Indonesian Republicans. Any intrusion upon Dutch sensibilities or any outright effort to open trade with the Republican faction might have endangered our relations with other colonial powers, as well as the Netherlands, and might have retarded the resolution of the Dutch-Indonesian conflict which seemed upon the brink of fulfillment.

It was under these circumstances that Isbrandtsen, without awaiting ratification of the Linggadjati agreement, in an effort to establish its own position as commission merchant for the Republicans, attempted to bring out from a Republican port a cargo of 5,000 tons of rubber, substantially all of which was produced prior to World War II on Dutch estates. It is this shipment which is the subject of the present action.

On January 20, 1947, Isbrandtsen, through Smith, its Vice-President, and Ryan, its General Counsel and Director, proposed to Proctor, Vice-President of R. D. C., the sale of 5,000 tons of Indonesian rubber. They were told that

State Department clearance was required.

Ryan's first effort to get this clearance was unsuccessful. He was told that the proposal was premature. R. D. C. was apparently given similar advice.

Ryan pursued the matter, however, and a week later, E. C. Zimmerman, Trade Commissioner of the Netherlands East Indies Government, told the appropriate officers of the Department of State, that the Netherlands favored the proposal, provided the seller could present satisfactory evidence that the goods were its property and not the property of Dutch nationals. Apparently Zimmerman believed that the Dutch were ready to permit export by the plaintiff, acting as a government agency, albeit of an unrecognized government, as distinguished from the individual smugglers and looters who had been trying to carry rubber to Singapore.

Expressly on the sole basis of Zimmerman's assurance, the State Department informed Ryan that it had no objection to Isbrandtsen's proceeding with this transaction at its own risk and responsibility, provided there was assurance that the goods exported were the property of the Indonesian vendor and that N. E. I. export duties were paid.

Ryan agreed that plaintiff would meet these conditions.

Zimmerman was wrong. On January 28th, the day after the Department had expressed its lack of objection to the proposal, the Netherlands East Indies Government promulgated a new export regulation of which Zimmerman had had no warning. The new regulation prohibited the export of rubber from Java unless it could be affirmatively shown that it was not estate produce. Present ownership of the rubber was not determinative; its export was forbidden if it originated from Dutch estates. The prohibition was made effective by requiring a specific permit for each cargo, to be issued by N. E. I. authorities.[1] Vessels loading in ports held by the Republicans, although permitted to load, were to be required to go by the shortest route to one of the Dutch held ports to obtain such a permit in order to be permitted to carry the rubber from Indonesia.[2] These regulations went into effect on the following day, January 29, 1947.

The officers of the State Department familiar with this transaction did not learn of the new regulations until February 4th, when Zimmerman informed

---

1. The decree of the Lieutenant Governor General of January 28, 1947 provides (Exhibit W):
 "It is hereby approved and decided:
 " * * * that unless covered by a general or specific permit issued by or on behalf of the Director of Economic Affairs, the following is prohibited:
 "1. the export of all goods from the customs area of the Netherlands Indies.
 "2. the export of all goods from the areas of the Netherlands Indies lying outside the customs area to other countries.
 * * *".
 The general permit of the Director of Economic Affairs excepted from goods authorized for export, rubber from Java. It provided:
 "The Director of Economic Affairs * * * has decided:
 * * * * *
 "3. to permit the export of all goods from the parts of the customs areas of the Netherlands Indies which are not the [de] facto under the authority of

the Government of the Netherlands Indies,
 * * * * *
 "b. insofar as Java and Madoera are concerned with the additional exception of:
 * * * * *
 "2. Rubber (hevea), manufactured or not * * *".

2. The general permit provides:
 "The Director of Economic Affairs * * * has decided:
 * * * * *
 "2. to permit the carriage by sea of [rubber and other scheduled products] * * * from ports lying within the customs area of the Neitherlands Indies, where there is no authority competent to issue the permits mentioned in this Decree, by the shortest route to the nearest port in the direction of the destination where there is such an authority as well as to intermediate ports on this route."

them. Zimmerman admitted he could not validate the assurances which he had previously given and he agreed to so advise Ryan, of Isbrandtsen. He did so on that day by telegram.[3] On the following day, February 5th, Mr. Frederick E. Nolting of the State Department, both by telephone and by telegrams, drew Ryan's attention to the new regulations and informed him that the State Department was advised that they would be strictly enforced, that most of the rubber then in warehouses was believed to be estate owned, and that its export would be prohibited. He further re-emphasized that the N. E. I. government was the sovereign authority in Indonesia recognized by the United States. Ryan acknowledged that he had received Zimmerman's telegram and told Nolting that he was going to Java to see that all regulations were strictly obeyed.

On February 1st, after State had expressed its lack of objection and prior to being informed of the new N. E. I. regulations, Isbrandtsen had diverted to Cheribon, Java, the proposed port of loading, a vessel it held on charter from the Maritime Commission, the S. S. Martin Behrman, then enroute from Manila to Singapore. Isbrandtsen[4] had radioed the Master to load rubber and other products of plaintiff. It assured him that it held all approvals "including express permission by United States State Department."

On February 3rd, also prior to the learning of the new regulations, Isbrandtsen was told by R. D. C. that it expected clearance from State and Isbrandtsen was invited to submit a formal offer. Accordingly, on that day, it wrote R. D. C. as follows:

"February 3, 1947

"Rubber Development Corporation,

15 William Street
New York, N. Y.

"Attention: Mr. Larry Proctor.

"Dear Sirs:

"For account of Perseroan Bank dan Perniagaan of Djokjakarta, Java, we hereby offer you up to five thousand (5000) long tons of Java rubber at one eighth (⅛) cents off the standard base price of R. M. A. established types as determined on inspection on arrival at United States ports by an authorized Crude Rubber Inspector. This offer is made F. O. B. ocean vessel at port or ports in Java destined for continental U. S. A. ports.

"We understand the present price for standard ribbed smoked sheets, R. M. A. No. 1, rubber, under quota, is twenty and one quarter (20.25) cents per pound F. O. B.

"Freight will be at full present conference rate of $25.00 per 50 cubic feet plus 15%. All insurable risks to be covered by and for account of buyer.

"We expect this rubber to come forward on our American SS 'Martin Behrman' from Cheribon and Probolinggo, Java, and that the vessel will be ready at first loading port about February 6th, 1947.

"Kindly confirm your acceptance of this offer.

"Yours very truly,
Isbrandtsen Company, Inc.
W. Everett Smith,
Vice-President."

"WES:JK

Isbrandtsen learned of the new N. E. I. regulation on the following day; R. D.

---

3. On February 4th, Zimmerman telegraphed Ryan:
 "Further To Our Conversations Of January 27 Draw Attention To New Netherlands Indies Government Import And Export Regulations In Force As Of January 29 Prohibiting Exportation Of All Estate Produce And Permitting All Other Exports Only With Licenses From The Netherlands Indies Government Stop Inasmuch As All Sugar And Rubber From Java Practically Certain To Be Estates Produce It Appears That No Such Produce Can Be Exported."

4. Unless otherwise indicated radio messages stated to be from "Isbrandtsen" were sent by Hans Isbrandtsen, President of Isbrandtsen, Incorporated.

C. did not learn of it until February 17th, Isbrandtsen did not retract its letter nor did it inform R. D. C. of the new regulation. Smith, Isbrandtsen's Vice-President, testified that he saw no reason to "muss up" the transaction and that, in any event, he assumed that the State Department had kept R. D. C. informed. In fact it had not.

The Martin Behrman arrived off Cheribon on February 5th in the evening. Early the following morning it approached the roadstead to receive its cargo. An N. E. I. destroyer, the Kortenaer, stopped it and sent two officers aboard. They gave the Master, Rudy Gray, a message from the American Consul General at Batavia, which read as follows:

"You Are Advised That Rubber And Sugar Are Legally Classed As Estate Products And May Not Be Exported Without Export Permits Issued By The Netherlands Indies Authorities, That Your Ship Is Subject To Dutch Naval Control Both In And Out, That If You Load These Commodities Your Ship Will Be Seized And Taken To Dutch Port For Unloading And That You Should Proceed To Semarang Or Tandjong-Priok For Consultation With Proper Dutch Authorities."

Gray radioed Isbrandtsen as follows:

"Arrived Cheribon 0700 Sixth Stop East Indies Authorities Have No Permit To Load Us Stop Consul At Batavia Inform Me That Cargo Cannot Be Loaded Until These Permits Issued Stop If We Load Here The Dutch Navy Will Take Us To Batavia And Confiscate Cargo."

Gray testified, however, that Commander Fortuyn, the commanding officer of the destroyer, came on board and told him that he could load, but that he would have to take his cargo to Batavia to obtain an export permit. Gray agreed to this.

Isbrandtsen, although now informed by both Zimmerman and the State Department of the new regulations and that Zimmerman could not validate the assurances upon which the State Department had expressly based its lack of objection, replied to Gray:

"Repeat Hold Clearance United States Government Follow Instructions Our Cables One And Two [to load rubber of plaintiff] Confirm."

Gray to Isbrandtsen:

"Proceeding Friday Morning Loading Dutch Destroyer Standing By And Commander Informs Me He Will Have To Send Us Batavia On Completion."

Isbrandtsen to Gray:

"Pay No Attention Local Gossip Stop Cargo Representative Victor Berge Who Will Endeavor Assist You Probably Arriving Cheribon Today."

On the following day Isbrandtsen cabled further:

"No Necessity Anyone Standing By Or Conferring With Anyone So Doing Stop You Will Be Instructed By Us In Due Time After Conference With United States Authorities With Respect To Your Departure And Destination Stop Your Information Batavia Call Unlikely Stop James Ryan Director Our Firm Left San Francisco Today Enroute Java Details Arrival Later Acknowledge."

On the following day, February 7th, at 6:20 A.M. Cheribon time (approximately February 6th at 6:20 P.M. New York time), the Martin Behrman, after informing the Commander of the destroyer as to Isbrandtsen's instructions, proceeded into the Cheribon roadstead to load. The N. E. I. destroyer anchored just outside of her. Loading of rubber into lighters commenced that day and the loading on board the Martin Behrman the following morning at 9:00 A.M. (9:00 P.M. February 7th, New York time).

On February 7th, at the office of the R. D. C. in Washington, General Counsel Raymond J. Consley, having been informed by retiring President Grant, that the State Department had "cleared" Is-

brandtsen's transaction, secured Executive Committee approval for a letter of reply to the offer of Isbrandtsen. The letter enclosed a two page blank, printed form contract of the type used by R. D. C. in its other Far Eastern transactions. The letter read:

"February 7, 1947

"Isbrandtsen Company, Inc.
 26 Broadway
 New York 4, New York

"Gentlemen:

"We have your letter of February 3 in which you offer up to five thousand (5000) long tons of natural rubber to be shipped from Java by Perniagaan of Djokjakarta, Java, at a basic price of 20⅛ cents per pound for R. M. A. 1X and/or 1 Ribbed Smoked Sheets, f. o. b. ocean steamer at port or ports in Java destined for continental U. S. A. ports. Ocean freight to be at the current conference rate of $28.75 per ton of fifty (50) cubic feet. Final determination of quality and weights is to be made after arrival at U. S. A. port.

"We understand that your steamer, the SS Martin Behrman, is to be ready at the first loading port on or about February 6, 1947 and will be able to handle the entire 5000 long tons. We are prepared to accept this rubber on an F. O. B. steamer basis for February shipment only. If the rubber is not shipped in February it will be necessary for you to reoffer on a Cost and Freight basis. Shipment in any event must not be later than March 31, 1947. As soon as you have particulars of shipment of rubber we suggest that you prepare contracts to cover the quantity and price of the several grades shipped in accordance with usual procedure on the F. O. B. contract form enclosed. Such contracts should be sent to Mr. G. W. Sniffin, Buying Agent, Rubber Development Corporation, 15 William Street, New York, N. Y., and should contain the necessary qualifications to conform to the above terms.

"Marine insurance only will be covered by Rubber Development Corporation and will attach only from the time the rubber is placed on board ocean steamer destined for U. S. A. port.

"We wish to reiterate that these purchases from you over and above your regular quota are possible only because you are offering the rubber at less than our regular established prices.

"Yours very truly,
Richard Baybutt,
President."

Although the letter bears the receipt stamp of Isbrandtsen dated February 8th (Saturday), it was first acted upon February 11th, when Isbrandtsen cabled plaintiff that rubber had been sold to the "United States Government". On February 13th Smith cancelled Isbrandtsen's insurance on the rubber for marine risks after loading. Prior to that, on February 8th and February 11th, the coverage of Isbrandtsen had been increased as reports of loading progress were received.

On February 13th, the Dutch placed two armed guards aboard the Martin Behrman to make sure it did not attempt to escape. Although this was referred to as a routine caution, the step was taken after some extravagant messages had been radioed by Berge, an agent of Isbrandtsen in Indonesia, to the effect that he and Captain Gray "broke blockade" and at about the time Gray had radioed Isbrandtsen "Your information Berge ordered markings removed from cargo before my arrival". The Dutch had been monitoring messages transmitted over the radio of the Martin Behrman. Gray informed Isbrandtsen of the posting of the guard and Isbrandtsen protested to the Secretary of State, and was promptly told (February 19th) that the Dutch were the recognized sovereign; that they were entitled to take such steps; and that it had no grounds for protest. Isbrandtsen gave no information as to any of these occurrences to R. D. C.

On February 13th, Isbrandtsen modified and filled out the form contract which had been enclosed in R. D. C.'s letter of February 7th and it was executed by Smith, Vice-President. It was

apparently received by Sniffin, R. D. C.'s New York purchasing agent, on Friday, February 14th. On Monday, February 17th, he and Proctor, R. D. C.'s former Vice-President, then acting as consultant, discussed with Isbrandtsen certain suggestions for revision, primarily dealing with safeguards as to quantity and quality, shipping tolerances, and shipping documents. Isbrandtsen made some but apparently not all changes suggested. The purchasing agent thereupon telephoned the President of R. D. C. for instructions and ultimately mailed the form to his Washington office with these questions unresolved.

In Washington, on February 17th, Consley, General Counsel of R. D. C., learned of the new N. E. I. regulation and of the events which had occurred between January 31st and that date. On February 18th Consley telephoned Smith, of Isbrandtsen, and told him that he had been informed of the communications between State and Ryan and that it was necessary that R. D. C. be governed by the policies of the State Department. He told Smith:

> " * * * that we understood that an export permit was necessary to bring the rubber out of Indonesia, that we expected them to get that permit if they could and that we hoped that they would be able to, and I told him that naturally we would not do anything further until the export permit had been granted."

Smith told him that Isbrandtsen was trying to get an export permit and would continue to do so.

Smith, in his deposition, claimed that the telephone connection was so bad that he could not understand the conversation but I believe he lied. His cross-examination forced him from inconsistency to inconsistency and the files of the Aetna Company, Isbrandtsen's insurance carrier, contain the following notation:

> "R. D. C. * * * telephoned Isbrandtsen that it would not sign contracts for purchase of rubber until Isbrandtsen had received permit from Dutch to sail."

Consley's demeanor was that of a frank and accurate witness. He confirmed this conversation by letter apparently drafted that day but not mailed until February 25th, to permit State Department clearance. In so far as the relation of the telephone conversation was concerned there was no difference between the original draft and the final letter. The letter which was received by Isbrandtsen without protest or comment reads:

"February 25, 1947

"Isbrandtsen Company, Inc.

26 Broadway

New York 4, New York

"Attention: Mr. Everett Smith

"Gentlemen:

"This will confirm my telephone conversation on February 18, 1947 with Mr. Everett Smith of your company regarding the export of approximately 5,000 long tons of natural rubber from Java. The information available to this office indicates that on January 28 you were advised by Mr. E. C. Zimmerman, representing the Netherlands Embassy in Washington and the Netherlands East Indies Government, that the export of the above rubber from an Indonesian port to the United States would not conflict with existing N. E. I. trade regulations, provided the required export duty was paid and clear title of the Seller was established. Acting on assurances given both to you and to the Department by Mr. Zimmerman, the Department of State on the same day advised you that it interposed no objection to you undertaking the commercial transaction at your own risk and responsibility. On January 29 the N. E. I. Government decreed new trade regulations, effective immediately, which applied to the entire area of the N. E. I. On February 4 after receipt of information concerning the new trade regulations, Mr. Zimmerman immediately wired you to the effect that the new trade regulations would make illegal the exportation of rubber from Indonesian ports. On February 5 the

State Department called your attention to the new regulations and advised you that your adherence to all existing N. E. I. regulations was required.

"Unfortunately this Corporation was not advised by either the Department of State or Mr. Zimmerman of the new trade regulations decreed by the N. E. I. Government until after mailing our letter of February 7 which obviously was written by this Corporation under the mistaken belief that the N. E. I. Government had granted permission for the exportation of the rubber in question.

"During the telephone conversation Mr. Smith stated that he clearly understood that it was the responsibility of your Company to obtain the necessary export permit from the N. E. I. Government. This coincides exactly with our understanding and I am sure you will appreciate that Rubber Development Corporation, as an agency of the United States Government, must be concerned with inter-governmental policy considerations. Accordingly, this Corporation will take no further action in the matter until permission to export the rubber has been obtained by you from proper authorities of the N. E. I. Government and you should be governed accordingly.

"It will be greatly appreciated if you will keep this Corporation fully informed as to all developments, and it is hoped that you will be able to obtain the necessary permission to export the rubber.

"Very truly yours,

Raymond J. Consley,

General Counsel"

R. D. C.'s records of routine transactions were kept under "contract numbers" given out by its purchasing agents for each shipment, installment, or portion of a shipment convenient. Isbrandtsen had been tentatively assigned numbers for portions of the rubber already loaded in this transaction. The record contains appropriate notations to show the tentative nature of the assignment. On February 18th Isbrandtsen was told by the New York purchasing agent that he had been told that he was not even to assign them numbers for subsequent installments.

On February 25th Captain Gray told the Commander of the N. E. I. destroyer that he would finish loading on the 27th. On the following day, he so informed Isbrandtsen and on that day Isbrandtsen, without authorization of R. D. C., radioed him, in part, as follows:

"When Finished Proceed *Direct* Colombo Ceylon Repeat Colombo Ceylon For Bunkers * * *".

[Emphasis supplied.]

Captain Gray replied:

"Acknowledge Cannot Take These Dutchmen Who Still Aboard With Me Advise."

Isbrandtsen replied:

"Confer Ryan [then in Java] Thereon And Report Here."

That day the Dutch guard was doubled from two to four.

On the following day when Captain Gray returned from shore, where he had been preparing the bills of lading and other papers necessary to his departure, he found a Dutch officer and nine Dutch sailors on board the Behrman. He was told by Commander Fortuyn, that he would be required to sail for Batavia on the following morning because his loading had been completed. Gray argued that he needed more time to get his sailing documents. Fortuyn agreed to give him another day, both to get these documents and to confer with Ryan, if Ryan arrived at Cheribon. Gray so informed Isbrandtsen.

After informing Isbrandtsen of this, Gray received a radio message from Ryan telling him not to sail. Captain Gray, however, was out of fresh provisions and concluded that he should follow the advice of the American Consul General and obey the order of the Dutch Commander. Accordingly, he sailed for Batavia on March 1st, arriving March 2nd. The Dutch destroyer accompanied him there.

The order of the Dutch Commander was given pursuant to direction of the N. E. I. naval command, under authority

of an ordinance which permitted it to compel a dangerous vessel to proceed to an adjacent N. E. I. port.[5] The theory was that once fully loaded the Martin Behrman was likely to attempt to escape and thereby provoke armed hostilities which would endanger life and property.

After her arrival in Batavia the Dutch naval authorities took control of the Martin Behrman. The rubber was found to be substantially all of estate origin. Although of a type customarily wrapped in mats and teak cases it was found in a bareback condition. Fragments of former wrappings were found stuck to the rubber and its clean outer surface evidenced the recent removal of its cases. Very few marks of origin were found except among bales of ribbed smoked sheets which were customarily marked and shipped bareback. On some of these the marks were only partially defaced. It had the clean, regular, well formed characteristics of bales of estate rubber, rather than the ill-formed, irregular, dirt impregnated qualities of rubber produced upon small native farms.[6] It was replevied by the Beheers Institut, a Dutch organization, acting on behalf of the absent estate owners.[7]

On February 9, 1948, eleven months after the loss of the rubber and after Isbrandtsen had commenced legal proceedings and diplomatic proceedings as trustee for the *plaintiff* as owner of the lost cargo, bills of lading for the shipment in question were first presented to the defendant. They had been made out to Isbrandtsen, Incorporated, and assigns, and bore an undated endorsement to the defendant.

 The first question is whether a contract between the parties ever existed. There is no doubt that plaintiff and Isbrandtsen had reached agreement as to price and other important elements of the proposed contract. There were, however, details important in a transaction of this size still to be settled and the question is whether the parties intended to be bound before they were finally resolved. This is a question of fact to be determined from their acts and communications. 1 Corbin, Contracts, § 30. Although mere intent to formalize an agreement is some evidence of an intent not to be bound by prior correspondence See 1 Corbin, Contracts § 30; El Reno Wholesale Grocery Co. v. Stocking, 293 Ill. 494, 127 N.E. 642, 645, it is not conclusive. 1 Restatement, Contracts § 26; see Sanders v. Pottlitzer Bros. Fruit Co., 144 N.Y. 209, 39 N.E. 75, 29 L.R.A. 431; Lehigh Structural Steel Co. v. Great Lakes Const. Co., 2 Cir., 72 F.2d 229, 230. On the other hand, if the agreement is expressly subject to the execution of a formal contract, this intent must be respected and no contract found until then. Winn v. Bull, 7 Ch.D. 28, cited with approval in Lehigh Structural Steel Co. v. Great Lakes Const. Co., supra, 2 Cir., 72 F.2d 229, 230–231; Guarantee Const. Co. v. Rickert-Finlay Realty Co., 88 Misc. 73, 150 N.Y.S. 551. Where the in-

---

5. See Exhibit 92, a translation of the 1939 ordinance.

Article 18 reads, in part:

"The * * * vessel with all persons aboard can be taken to an adjacent Netherlands East Indian harbor in the follow cases:

\* \* \* \* \*

"b. if there is a reasonable surmise that a punishable deed as meant in Art. 14 [violations of export-import regulations] has been committed or behavior took place as meant in Art. 16,† and if moreover there exists the danger that the vessel flees through leaving the Netherlands East Indian water area or withdraws in some other manner from further investigation".

† The "behavior as meant in Art. 16" is, according to that Article, as follows:

"* * * if a vessel or ship in the Netherlands East Indian water area conducts herself in such a manner that safety, public order or other public interests of the Country are encroached upon, also if it can be reasonably surmised that the intention for such behavior exists. * * *".

6. For full report of inspection see Exhibit AQ.

7. No finding is made as to the legality or illegality of the N. E. I. proceedings. That fact is not necessary to this determination.

tent is less sharply expressed the trier of the facts must determine it as best he can. See Winn v. Bull, supra, 7 Ch. D. 28; 1 Corbin, Contracts § 30. The factors to be taken into account are suggested in Mississippi & Dominion Steamship Co. v. Swift, 86 Me. 248, 29 A. 1063, 1066–1067 and followed in Barber-Colman Co. v. Magnano Corp., 1 Cir., 299 F. 401, 404. Custom and usage may be determinative. 1 Corbin op. cit. 80. The more important and complex the transaction the more likely the parties to intend not to be bound until a formal contract has resolved all questions between them. Ibid. It is my conclusion that the parties did not intend to be bound until a final, formal contract was executed by both.

R. D. C., which executed a great number of contracts for vast sums of money, consistently insisted upon the formalization of its agreements,[8] and any transaction not easily adapted to already approved forms required express authorization by the board of directors. The need for encompassing each transaction in a standardized single document is understandable from the volume of its business and its practice of reselling the rubber before arrival in the country. Insistence on a formal agreement is also more likely to be expected in a government agency dealing with public funds and subject to investigation and audit. Furthermore, R. D. C. was in such command of the market that it could compel

importers to accede to its insistence in this regard. Such an insistence was not unconscionable; it had been accepted by the entire rubber trade as well as Isbrandtsen. It is not to be disregarded simply because Isbrandtsen saw fit to go forward with the transaction before negotiations were completed.

Plaintiff's first claim is that the letter of February 7th was an acceptance of the offer of February 3rd. In a loose sense it was; it invited a formal proposal; it showed a willingness to accept subject only to conditions which Isbrandtsen was likely to meet. Actually, however, it was not an acceptance, it was a counter-offer. It proposed that the f. o. b. price be applicable only to February shipments; that March shipments be offered on a cost and freight basis; that R. D. C. would not accept cargo shipped after March 31st. It did not constitute an acceptance even for so much of the 5,000 tons of rubber as might be shipped in February under the proposed f. o. b. price; rather it asked that Isbrandtsen submit formal contracts when it knew what grades and amounts it could deliver. In other words it asked Isbrandtsen to commit itself to a specific amount and quality if the counter proposal was acceptable. Even though a reply to an offer purports to accept it, if it adds qualifications or requires the performance of a new condition, it is not an acceptance but a counter-offer. 1 Restatement, Contracts § 60; 1 Corbin,

8. See Consley's testimony S.M. 842–844.
R.D.C.'s letters to the trade establishing the procedure to be followed read:
" * * * it being understood that all purchases * * * shall be effected by purchase contracts in form satisfactory to the General Counsel and approved by the Directors". (Exhibit BJ.)
" * * * All purchases shall be effected on the terms and conditions contained in the form of Crude Rubber Contract attached hereto * * *.
"Rubber Development Corporation reserves the right to refuse to purchase all or any part of the aforesaid amounts * * * at any time prior to the actual execution of a purchase contract for the amounts shown thereon * * *". (Exhibit 27.)

The Executive Committee authorization to its buying agent read as follows:
"The Treasurer of this Corporation * * * has been authorized and directed (a) to take such action as he may deem necessary and appropriate to effect payment on behalf of this Corporation of statements, invoices, or other billings rendered by Sellers in accordance with the provisions of the aforesaid contracts; provided, that with respect to each such billing he has first received the related original contract signed by the Seller and by you on behalf of this Corporation * * *". (Exhibit BL.)
In the face of these letters and Consley's testimony, Smith's suggestion that a formal contract was not always required is disbelieved.

Contracts § 82; Minneapolis & St. Louis Ry. v. Columbus Rolling-Mill, 119 U.S. 149, 151, 7 S.Ct. 168, 30 L.Ed. 376; Columbia Malting Co. v. Clausen-Flanagan Corporation, 2 Cir., 3 F.2d 547, 549.

■ Neither do I believe that Isbrandtsen's return of the modified and executed printed form constituted a final acceptance of R. D. C.'s counter-offer.[9] It did show a good faith effort to adapt the standard R. D. C. form to the conditions of the R. D. C. counter-offer, and the essence of the contract could be spelled out by a court if the negotiations had stopped at this point, were it not for my conclusion that R. D. C. did not intend to leave its contracts subject to such implementation and that Isbrandtsen from its previous dealings with R. D. C. knew its intent in this regard and acquiesced in it.

■ The fact that in the executed form Isbrandtsen, rather than plaintiff, is designated as "seller" is not significant on the question of whether a contract was reached. It was in accordance with the R. D. C. standard practice of not dealing directly with the Far Eastern shipper, and was within the contemplation of the R. D. C. letter, which invited a proposal in accordance with the usual procedure.

The details which the parties had discussed but not settled related to the provisions for defects in quality or weight. Isbrandtsen had proposed that final determination of weight be made after arrival in the United States. The R. D. C. letter proposed that final determination of quality as well as weight be so made. Under the standard contract the cargo was weighed at point of shipment; weight notes were required to be presented with the bill of lading before payment; tolerances as to shrinkage during shipment were expressly stipulated; and the United States seller was required to seek adjustments with the Far Eastern shipper if the difference in weights exceeded those tolerances. The "seller"

was not, however, required to be a guarantor of either weight or quality; he merely agreed to forfeit a premium which would otherwise be his, if these adjustments were not obtained. In an attempt to adapt the form to the letter, Isbrandtsen struck from the form the provision requiring the presentation of weight notes and that establishing acceptable tolerances. It inserted a provision "Quantitative and qualitative determinations on arrival". The R. D. C. purchasing agent contended that to give full effect to the letter, Isbrandtsen should also accept responsibility as guarantor of the weights and quality of the shipment. In support of this position it was apparently urged that the cargo would ordinarily be paid for and resold prior to arrival in the United States and that unless R. D. C. could look to Isbrandtsen this would be risky without weight notes, especially in view of the inexperienced character of the Far Eastern shipper.[10] In this inconclusive posture the matter was referred to the President of R. D. C. He never acted because by the time it reached him he learned of the unfavorable N. E. I. export regulations and on that day Consley, General Counsel of R. D. C., telephoned Smith of Isbrandtsen and told him that R. D. C. would do "nothing further" until Isbrandtsen obtained an export permit.

Although the parties were close to complete agreement, the mechanics for dealing with shortages and defects in a shipment costing two million dollars could have substantial importance. I do not believe that Isbrandtsen was justified in assuming that R. D. C. in its last few weeks of existence would depart from its consistent policy of refusing to be bound without a formal contract.

Looking to the conduct of the parties as well as to the terms of their communications, the answer is still the same. The loading of the rubber itself created no liability on the defendant. It did not start at the urging of R. D. C. It started

9. The form as executed is Exhibit 5.

10. See Consley's testimony, S.M. 837; 897–898; 908.

before R. D. C. had replied to Isbrandtsen's offer and before it had fixed February shipment as a condition to be met. It continued unaffected by the negotiations, as rapidly as the poor facilities at Cheribon permitted. Isbrandtsen's cancellation of its insurance for marine risks was apparently not communicated to R. D. C., certainly not to any officer having authority to bind the corporation.

▇▇▇▇ Next, even if there were a contract between the parties, it was rescinded by Consley in his conversation with Smith on February 18th. The language was sufficiently unequivocal. Consley testified:

" * * * I told him that naturally we would not do anything furter until the export permit had been granted".

Consley's letter of February 25th confirming the conversation states:

" * * * Accordingly, this Corporation will take no further action in the matter until permission to export the rubber has been obtained by you from proper authorities of the N. E. I. Government and you should be governed accordingly".

This meant that R. D. C. did not regard itself as bound and that further negotiations on the contract had ceased until an export permit was obtained. At this point plaintiff and Isbrandtsen were free to abandon their efforts to export the rubber and to do with it as they saw fit. R. D. C.'s expression of willingness to go ahead with the transaction after the export permit was obtained was at most a new offer.[11] It did not detract from the effectiveness of the rescission.

▇▇▇▇ R. D. C. had ample basis for rescission. See 3 Corbin, Contracts 443

§ 610. Prior to February 17th it acted in the mistaken belief that the export of this rubber was not only possible but assured. Its mistake was not due to its own negligence. Cf. Grymes v. Sanders, 93 U.S. 55, 61, 23 L.Ed. 798. The letter of February 7th had been justified by the views expressed only a week earlier by the State Department and by reliance upon the N. E. I. Trade Commissioner. R. D. C. had received no notice of the error or of facts which should have prompted further inquiry. The materiality of the mistake is beyond argument. Consley testified that if the facts had been known the letter of February 7th would not have been sent. The fact which was unknown to R. D. C. was crucial to the success of the transaction. It made it impossible to obtain the rubber for which R. D. C. was contracting.

Isbrandtsen must have known of R. D. C.'s mistake. See City of New York v. Dowd Lumber Co., 140 App.Div. 358, 125 N.Y.S. 394; Davis v. Reisinger, 120 App. Div. 766, 105 N.Y.S. 603; 3 Corbin, op. cit.; 5 Williston, Contracts, 4399, § 1573. It had been informed of the true facts by Zimmerman, the State Department, and the Master of its own vessel. It had been told that estate rubber could not be exported and, as a firm experienced in the rubber trade, it knew, as plaintiff established all experienced persons knew, that substantially all rubber for export from Java was produced upon former Dutch estates. It knew R. D. C. had no Far Eastern agents. It could not have believed that State was keeping R. D. C. informed because it knew that after learning of the new regulations State tacitly opposed and openly discouraged the undertaking [12] and it knew that R. D. C. would acquiesce completely in State's leadership in matters of this

11. Although Smith apparently expressed a willingness to go ahead on this basis his agreement would not have been enforceable against Isbrandtsen under the statute of frauds because he did not execute any writing. See Maddaloni Olive Oil Co. v. Aquino, 191 App.Div. 51, 180 N.Y.S. 724; N.Y. Personal Property Law, § 85.

12. Ambassador William S. B. Lacy testified that State's telegrams of February 5th were "pungent" warnings to Isbrandtsen. State did not feel it could forbid Isbrandtsen or any other private citizen from attempting to go ahead but it advised and warned against it.

nature. Otherwise R. D. C.'s original insistence upon State Department clearance would have been meaningless. In the light of facts known to Isbrandtsen, R. D. C.'s letter of February 7th was inexplicable except as one written in ignorance of the new regulation.

■ Under these circumstances, it would be unconscionable to hold R. D. C. to the contract. At the time of rescission Isbrandtsen and plaintiff could have returned the rubber to the warehouse. The liability for the expense involved could have been litigated. They had lost no other sale nor could they have made one under the circumstances. Inability to restore the rubber now is no bar to rescission. Isbrandtsen and plaintiff who had already exposed the rubber to danger without R. D. C.'s consent and continued to do so even after rescission were the ones who made its return impossible. See Hamrah v. N. N. Maloof & Co., 127 App.Div. 331, 111 N.Y.S. 509, 511. See also Richardson Lumber Co. v. Hoey, 219 Mich. 643, 189 N.W. 923, 925.

■ If a contrary conclusion should be reached, that a contract existed, a question of interpretation would then remain. Was it a condition precedent to R. D. C.'s obligation to receive the rubber that plaintiff's agent obtain an export permit from the N. E. I.? Even though it may be assumed that the usual rule under an f. o. b. ocean vessel contract is that the buyer is to obtain export permits and pay export duties,[13, 14]

this responsibility may be shifted to the seller by agreement of the parties. It is my conclusion that, in fact, the parties did intend to shift it and that they contemplated R. D. C.'s obligation as subject to the condition precedent that Isbrandtsen, as agent for plaintiff, obtain the export permit. In such a case rules for the interpretation of f. o. b. contracts in the absence of such evidence of intent have no application. See Goodyear Tire & Rubber Co. v. Northern Assur. Co., 2 Cir., 92 F.2d 70, 72.

■ Preliminarily it should be observed that regardless of the relationship between plaintiff and Isbrandtsen, plaintiff could have no better standing under the contract than Isbrandtsen. Plaintiff is, of course, entitled to recover on Isbrandtsen's contract notwithstanding its characterization of Isbrandtsen as "seller" and plaintiff as "shipper" because R. D. C. knew that Isbrandtsen was plaintiff's agent. 2 Restatement, Agency § 292. But plaintiff has no rights under the contract beyond those of Isbrandtsen. It cannot recover if Isbrandtsen could not recover. Ibid. § 298. If R. D. C. was not to pay until Isbrandtsen did certain things as "seller", plaintiff may not recover unless those things were done, and done in the way intended.

My conclusion that the parties intended that R. D. C.'s obligation be subject to the condition that Isbrandtsen, as agent for plaintiff, obtain the export license is based upon the following facts:

---

13. Here the R.D.C. form contract expressly provided that export duties were to be paid by the American seller for the account of the Far Eastern shipper.

14. For generalizations as to the duty of buyer to obtain an export permit see 2 Williston, Sales § 280(*l*); Brandt & Co. v. Morris & Co., 2 K.B. (1917) 784, 795, 798; Krauter v. Menchacatorre, 202 App.Div. 200, 195 N.Y.S. 361. However, the recent case, A. V. Pound & Co. v. M. W. Hardy & Co., (1956), 2 Weekly L.R. 683, 694, 697, warns against such generalizations. In particular Lord Somervell states:

"The observations, if general, must be confined to cases where both parties are within the jurisdiction of the licensing authority. I do not say the conclusion is necessarily different if they are not, but different considerations arise. Even so, I think this is an area in which it is impossible to lay down general rules. * * *".

Amtorg Trading Corp. v. Miehle Printing Press & Mfg. Co., 2 Cir., 206 F.2d 103; Miehle Printing Press & Mfg. Co. v. Amtorg Trading Corp., Sup., 124 N. Y.S.2d 5; Bardons & Oliver, Inc., v. Amtorg Trading Corp., Sup., 123 N.Y.S.2d 633, affirmed 275 App.Div. 748, 88 N.Y.S. 2d 272, affirmed 301 N.Y. 622, 93 N.E. 915, are readily distinguishable on this basis.

1. The alleged contract was never formalized. Accordingly all of the relevant conversations and acts of the parties must be considered.

2. It was intended that the contract be performed in compliance with all N. E. I. regulations. R. D. C. never agreed to participate. in a violation of them. Isbrandtsen had no basis for assuming that it had. R. D. C., as it was about to wind up its affairs, could not have been expected to risk an international incident to obtain a few thousand more tons of rubber. On the contrary, R. D. C.'s participation in the transaction was expressly subject to the condition of State Department clearance. This clearance, in turn, was upon the express condition of compliance with all regulations of the N. E. I., the recognized sovereign.[15] Ryan, who obtained the clearance, agreed that plaintiff would meet the conditions then proposed,[16] and even after learning of the new regulations and the requirement for an export permit he told Mr. Nolting of the State Department that he was going to Batavia to assure compliance with all N. E. I. regulations.[17]

3. Plaintiff was the only party with the information as to title and source of the rubber necessary to obtain a permit.

4. R. D. C. standard practice, known to all parties, contemplated that the United States "seller" would undertake all Far Eastern negotiations and Isbrandtsen, without consulting R. D. C., did undertake all negotiations for the export permit. R. D. C. had no agents of its own in the Far East and in the present case, it did not agree to help in obtaining the permit nor was it asked to help.

5. This view of the seller's duty was confirmed by the conversation between Smith and Consley on February 18th in which Smith acquiesced in Consley's insistence that it was up to Isbrandtsen to get the export permit. Consley's confirmatory letter, which Isbrandtsen did not contradict or qualify reads:

"During the telephone conversation Mr. Smith stated that he clearly understood that it was the responsibility of your company [Isbrandtsen] to obtain the necessary export permit from the N. E. I. Government. This coincides exactly with our understanding. * * *".

6. Except for routine duties as carrier,[18] Isbrandtsen, in these undertakings, was to act as agent of plaintiff not R. D. C. See 1 Mechem, Agency § 300. The standard R. D. C. procedure and form contract was designed to permit R. D. C. to deal with the "seller" as a principal and to avoid the necessity of direct dealings between R. D. C. and the Far Eastern shipper. The "seller", therefore, was in no sense an agent of R. D. C. His compensation was to be derived from the price.[19] Except for

---

15. See Exhibits H, I, M.

"* * * Since US Government recognizes Dutch sovereignty over all Netherlands East Indies, Department unable approve any action contrary to Dutch regulations regarding entrance to Indies ports or export Indies commodities. * * *". (Exhibit H.)

"* * * Department Advised Feb 4 By Zimmerman Representing Netherlands Embassy That N E I Authorities Will Strictly Enforce New Import Export Regulations Decreed Jan 29 In Batavia Text These New Regulations Not Yet Received By Department Understand Zimmerman Has Telegraphed You His Interpretation Effect New Regulations Upon Your Proposed Commercial Transaction With Perseroan Bank. Department Hereby Reemphasizes To You That N E I Government Is Authority Recognized By US Government In Entire Netherlands Indies". (Exhibit M.)

16. See Exhibit V.

17. See Exhibit N.

18. Isbrandtsen had agreed to act as carrier for R.D.C. but there is no suggestion that its contract for carriage at standard rates obligated it to obtain an export permit as agent for R.D.C. Captain Gray testified that ordinarily a carrier would not have even loaded under the circumstances.

19. The fact that this included certain premiums payable if the Far Eastern Shipper made appropriate adjustments in the price to meet deficiencies of quantity or quality does not alter the relationship.

certain premium payments specified in the R. D. C. contract, its amount was to be settled between him and the Far Eastern shipper without concern of the R. D. C. In the present case R. D. C. did not agree to compensate Isbrandtsen except as carrier nor did it have control over it. Cf. Columbia Univ. Club v. Higgins, [D.C.] S.D.N.Y., 23 F.Supp. 572. Isbrandtsen was compensated pursuant to an agreement with plaintiff by which it was to receive a five percent commission as commission merchant.

■■■ Accordingly, if there was a contract, plaintiff by failing to obtain an export permit failed to perform a condition precedent to defendant's obligation thereunder. The sale of the rubber was not contemplated by the parties except under conditions which would permit their export. Loading of the rubber without any reasonable likelihood of getting an export permit did not constitute substantial performance.[20]

■■■ Finally, even if R. D. C. had the obligation to obtain the export permit, the loading of the rubber under the circumstances was ineffective to constitute delivery. Viewed within the framework of the N. E. I. regulations it was an act of destruction just as inevitable as loading a cargo on a vessel known to be burning or sinking. There was no likelihood that the rubber was exportable under the N. E. I. regulations. Plaintiff knew that the rubber was estate produce,[21] and that, unless an exception to the N. E. I. regulations was created, the rubber would, upon loading, be taken to Batavia and confiscated. Any hope that the Martin Behrman would be permitted to lie fully loaded in the Cheribon roads was without reasonable basis. The N. E. I. too obviously anticipated an attempt to escape[22] and the N. E. I. could not be expected to devote one destroyer to the Martin Behrman exclusively for an indefinite period of time.

Further this risk of destruction was not an incident of plaintiff's transaction with R. D. C. It was incidental to the efforts of the Indonesian Republicans to hasten the collapse of the N. E. I. blockade.[23] By loading the rubber plaintiff

---

These premiums were an agreed part of the price. R.D.C. could not compel or control the seller's activities in this regard.

20. See 3 Corbin on Contracts §§ 705, 706, 711.

21. As a rubber dealer it knew that substantially all Java Rubber was estate produce. It had the appearance of estate produce. Captain Gray noticed plaintiff's officers were not very outspoken as to the origin of the rubber. Regardless of who destroyed its marks of origin plaintiff knew it could not prove its source to be other than the Dutch estates.

22. I believe Isbrandtsen intended to attempt an escape as a last resort. Isbrandtsen's messages certainly suggest it never intended for the vessel to go to Batavia as the N.E.I. regulation required From the outset it instructed Captain Gray that such a call was "unlikely". (Exhibit NN.) It told him to disregard the advice of the American Consul General and Commander Fortuyn as "local gossip" (Exhibit JJ) and to be guided by orders from Isbrandtsen which was dealing with the international aspects of the matter in Washington. (Exhibit NN.) These orders culminated in outright instructions to violate the regulations by proceeding directly to Colombo, Ceylon (Exhibit 94) and a further order by Ryan not to comply with Commander Fortuyn's order to sail to Batavia. The fact that Captain Gray, as a ship-master of exceptional good sense, never intended and ultimately refused to follow Isbrandtsen's orders did not reduce the risk of confiscation. The circumstances which put the rubber in jeopardy were not within his control.

23. The blockade was depriving the Indonesian Republicans of medicines, machines and other essentials. Even a single exception would at least indirectly hasten deliveries of some of these essentials and would also create a difficult precedent for the Dutch. In addition it would add to the humiliations the Dutch were suffering, the full exploitation of Zimmerman's mistake. It is unlikely that plaintiff would have taken this risk simply to establish a claim against R.D.C. It was not a seller trying to unload a shipment in a falling market in the hope of winning a future law suit.

and Isbrandtsen deliberately risked its confiscation in order to get the State Department to press the N. E. I. to create. an exception to its regulations.[24] Only by having a cargo of rubber at stake could Isbrandtsen get standing to exert pressure upon the State Department. The diversion of its empty vessel was not enough because the Dutch could have provided a legitimate cargo for her.

 Plaintiff was not authorized by R. D. C. to undertake this risk for such a purpose.[25] Regardless of who was to obtain the export permit, by knowingly so entrusting the cargo to Isbrandtsen,[26]

for exposure in such a manner, plaintiff not only failed in its obligation to exercise due care for its safety,[27] it also violated New York Personal Property Law, § 127(2)[28] which required it to make such a contract with the carrier as would be reasonable under the circumstances. For this omission the buyer may decline to treat delivery to the carrier as delivery to itself. See Madeirense do Brasil S/A v. Stulman-Emrick Lumber Co., 2 Cir., 147 F.2d 399, 403, certiorari denied 325 U.S. 861, 65 S.Ct. 1201, 89 L. Ed. 1982; Commonwealth Title Ins. &

24. There was some hope that the Dutch would yield. The State Department advanced the possibility to the Netherlands although it did not request it. The Linggadjati Agreement was awaiting ratification. The Western powers and in particular the United States were eager to open Indonesia as a source of scarce materials. Zimmerman's erroneous assurances supplied a plausible basis for a claim on behalf of Isbrandtsen which might have been twisted in favor of plaintiff as Isbrandtsen's principal. The vessel involved was government owned. R.D.C., a government agency, had been drawn into the transaction as the intended purchaser of the rubber. Even though the State Department was unsympathetic, Congressional Committee hearings offered an opportunity for a public controversy by which Isbrandtsen would be capable of embarrassing both the State Department and the Netherlands.

25. Nor was it necessarily required to do so to meet its obligations under the alleged contract in view of the known danger involved in loading the Martin Behrman at that time. Cf. J. H. Labaree Co. v. Crossman, 100 App.Div. 499, 92 N.Y.S. 565, 567–568, affirmed 184 N.Y. 586, 77 N.E. 1189; Takahashi v. Pepper Tank & Contracting Co., 58 Wyo. 330, 131 P. 2d 339, 348 et seq. As events subsequently turned out the rubber could have been safely exported on a cost and freight basis in March, after the Linggadjati Agreement was ratified.

26. Plaintiff, itself, left the entire handling of the matter to Isbrandtsen. Not only did it allow Isbrandtsen to exercise apparent control of the transaction but Captain Gray found that when he, notwithstanding his orders from Isbrandtsen, raised the question of risk of confiscation directly with the officers of

plaintiff they showed complete confidence in Isbrandtsen. Gray testified (S.M. 1870):

"We talked that [the risk of continuing to load] over, yes. And they — they didn't think there was as much risk as I did. They were trusting Isbrandtsen. His messages meant more to them than it did to me, because I knew Isbrandtsen was a business man, always picking up a bargain where he could get it, and they thought Isbrandtsen had complete backing of everybody. They thought that an American ship couldn't do any wrong. I had different ideas but I didn't tell them that. * * * They said they were willing to trust Isbrandtsen. That's the only thing I recall about it, that they were perfectly willing to trust Isbrandtsen. If he said 'Okay, load it', they would go ahead. I had to show them that I had notified Isbrandtsen. Just as soon as the Dutch guards were aboard there I had to show them [a] copy of the radio to convince them that Isbrandtsen knew it. They said, well, if Isbrandtsen knows it he is satisfied".

27. 2 Williston, Sales § 278b; Best Foods v. Mitsubishi Shoji Kaisha, 224 App.Div. 24, 229 N.Y.S. 364.

28. N. Y. Personal Property Law, § 127(2) reads:

"2. Unless otherwise authorized by the buyer, the seller must make such contract with the carrier on behalf of the buyer as may be reasonable, having regard to the nature of the goods and the other circumstances of the case. If the seller omit so to do, and the goods are lost or damaged in course of transit, the buyer may decline to treat the delivery to the carrier as a delivery to himself, or may hold the seller responsible in damages".

Trust Co. v. Gregson, 303 Ill. 458, 464, 135 N.E. 715.

■ Actually, loading of the rubber did not pass control to R. D. C. In accepting the rubber Isbrandtsen acted as agent of plaintiff not R. D. C.[29] The rubber was committed to use of plaintiff in a venture to which R. D. C. was not a party, the disruption of the N. E. I. blockade. R. D. C. had contemplated compliance with N. E. I. regulations not the use of its property to disrupt them. If the property in the rubber had passed to R. D. C. its use for this purpose by plaintiff or its agent without authorization of R. D. C. would have constituted conversion. R. D. C. was entitled to disregard delivery for such a purpose as constructively fraudulent. See In re Nesto, 3 Cir., 270 F. 503, 506–507; Keepers v. Fleitmann, 213 Mass. 210, 100 N.E. 333, 334.

In view of the conclusions already expressed that there was no contract, that if there was it was rescinded, and in any event never performed, it is unnecessary to discuss the other defenses pleaded by defendant. Accordingly, it is not necessary to pass upon plaintiff's title to the rubber, which would raise the question of the effect to be given the acts of the embryonic Indonesian government with respect to the collection and sale of the rubber. Neither is it necessary to pass upon plaintiff's claim that the acts of the N. E. I. in connection with its confiscation were contrary to law. The significant point is not their legality or illegality but the certainty that they would occur as they did. Even though Isbrandtsen or some expert might question their legality, it was obvious at the time of the transaction that the N. E. I. and the State Department were going to give effect to the N. E. I. regulations exactly as Isbrandtsen had been warned.

■ Insofar as plaintiff claims for goods sold and delivered, it is obvious that R. D. C. received no benefit from the transaction or any thing of value for which the law would imply a duty to pay. Even if the rubber had been permitted to remain safely on board the Martin Behrman in Cheribon it would have given plaintiff no basis for such a claim. The obtaining of an export permit by plaintiff was a condition precedent to any liability; there could be no partial performance without it. Even if there could, this is academic because plaintiff unjustifiably subjected the rubber to confiscation and thus R. D. C. received no benefit from the transaction at all. 5 Williston on Contracts § 1482; 3 Corbin on Contracts § 711; Restatement of Con-

---

29. Isbrandtsen acted throughout not as agent of R.D.C. but only of plaintiff. Its authority as carrier for R.D.C. did not extend to efforts to escape or to maneuvers to gain exceptions to the N.E.I. regulations. R.D.C. had not agreed to compensate or reimburse Isbrandtsen for such activities. It had no control over them. It was not kept informed with respect to them. It was not consulted when Isbrandtsen ordered the Martin Behrman to proceed directly to Colombo in violation of N.E.I. regulations. Neither was it consulted when Ryan directed Captain Gray to remain at Cheribon contrary to the orders of the N.E.I. navy. No officer or employee of Isbrandtsen communicated with R.D.C. except for the submission of routine reports as to the quantity of rubber loaded.

On the other hand, it emerges clearly from the record that, as between plaintiff and R.D.C., Isbrandtsen acted only as agent of the plaintiff. Its compensation and reimbursement were to be derived as commission merchant for plaintiff. It was only to plaintiff that it turned for specific authorization with respect to the hazards of loading. Captain Gray kept the officers of the plaintiff informed as to the hazard of confiscation, before beginning to load and again after the N.E.I. had posted guard on the Martin Behrman. Plaintiff was also apparently kept informed by Ryan who was in Java in consultation with the Republican leaders during the execution of the transaction. The bill of lading was not even made to the order of R.F.C., as called for by the alleged contract, but to the order of Isbrandtsen or its assigns. Confronted with the conflicts between R.D.C.'s alleged interest in the safety of the cargo and the furtherance of the objectives of the plaintiff. Isbrandtsen consistently served the plaintiff.

tracts § 348; See Gillis v Cobe, 177 Mass. 584, 596, 59 N.E. 455, 459; Taft v. Inhabitants of Montague, 14 Mass. 282; River Spinning Co. v. Atlantic Mills, C.C.R.I., 155 F. 466, 470.

Complaint dismissed.